HARRIS, Judge.
Appellant was convicted of violating the Alabama Uniform Controlled Substances Act and sentenced to five years in the penitentiary. He was represented by retained counsel and upon being arraigned he pleaded not guilty. After sentence was imposed, *1044 he gave notice of appeal and his sentence was suspended pending appeal.
Officer James Chambliss was employed by the Birmingham Police Department and assigned as an undercover agent with the United Narcotics Detail Operations. He testified that on September 26, 1973, he went to the home of appellant at 1228 — 47 Street, North, in Birmingham, Alabama, and bought 25 capsules from appellant at $1.00 per capsule. He stated that he walked upon the porch and before he could knock, appellant saw him and invited him in the house. He told appellant he wanted to buy some “reds” and appellant told him he did not have any “reds,” but he had some “yellow jackets” that he would sell him. Appellant went into another room and returned with 25 yellow capsules and counted them for him. He gave the officer a piece of aluminum foil and the officer put the capsules in the aluminum foil and carried the capsules to the U.N.D.O. Office where he turned them over to Sgt. J. E. Smith. Sgt. Smith opened the aluminum foil and examined the capsules in the presence of Officer Chambliss. Smith put the capsules in a brown evidence envelope and sealed it. Chambliss initialed the seal with “J.C.” and Smith put his initials “J.S.” on the seal. Chambliss positively identified appellant in court as the man he bought the capsules from on September 26, 1973.
Chambliss further testified that while he was in the appellant’s house, he observed appellant at the kitchen table and he had some green grassy stuff that he was placing in bags. He was asked if he ever had occasion to see marihuana prior to this date and he answered that he had seen marihuana many times. He was allowed to testify over appellant’s objection that this substance appeared to be marihuana.
On cross-examination appellant’s counsel went into the grassy substance referred to as marihuana. He proved that Chambliss did not try to buy marihuana and did not arrest appellant for possession of marihuana. Further, that the witness did not testify before the grand jury that appellant was in possession of marihuana at the time he purchased the capsules.
Mr. Charles Wesley Smith testified that he was a Criminalist with the State Department of Toxicology and Criminal Investigation and was so employed in September of 1973, and at that time he had been with the Department about 18 months. He stated he had a degree in chemistry from Auburn University. He further testified that on November 27,1973, he received an envelope from Mr. Craig Bailey which contained 25 yellow capsules marked with the “Abbott” symbol and that these capsules were wrapped in aluminum foil. He stated that he had been trained in chemical analysis of narcotics and other substances and had been doing so for about 18 months. That he performed certain chemical tests on the capsules in the envelope. At this point the defense objected to the witness stating the results of the tests he made on these capsules on the ground that he was not qualified to testify as he was still in a training program and that it had not been shown that he was qualified to testify as an expert. The Court overruled the objection and Mr. Smith was permitted to testify as to the findings of his analysis of the capsules. He stated that he did several tests and determined that each capsule contained 100 milligrams of phenobarbital. He said phenobarbital is classified as a barbiturate and that phenobarbital is a controlled substance, and it is listed in the Alabama Uniform Controlled Substances Act.
On cross-examination Mr. Smith testified that while he was in a training program in 1973, he was qualified as a crime laboratory technician at the time these tests were run — that he was pretty much on his own. That he was a trainee in theory, a crime laboratory technician working under the supervision of another. He then went on to describe the type of tests he performed on the capsules.
From the record:
“A. Right. A color test, a Dili-Coppaniy color test, which is a preliminary test that indicates a barbiturate, not a specific barbiturate but a barbiturate is present; *1045 then an ultra-violet spectrophotometry examination which further reinforces that a barbiturate is present; the infrared spectrophotometry examination which is conclusive evidence that a barbiturate is present; in fact, phenobarbital.
“Q. Is that all it determined, that a barbiturate was present?
“A. No, the infra-red is specific for pen-tobarbital. The others are for a barbiturate only but the infra-red did easily differentiate between the types of barbiturates.”
The trial court then interrogated the witness and we take the following from the record:
“THE COURT: I have got one I just want to ask him. Is barbiturate the same as barbital?
“A. Generally, barbiturate refers to a salt of barbital.
“THE COURT: Well, I’m looking at Section 258. It lists barbital — 258 Subsection 35, under Schedule 4.
“A. I don’t know if I have that in this— yes, sir, that can be considered as meaning barbiturate, right. They are all different forms of the same base product. “THE COURT: I see. Now I want you to do this. You spoke of a visual test then you spoke of a color test and I wasn’t sure how you work or do the color test to ascertain whether this is barbital or a barbiturate, whatever you call it. “A. It is called the Dili-Coppaniy test. “THE COURT: What does it mean? I mean tell me about the test.
“A. It is the man that did it really; but what you use is a few drops of a solution made of Vioth of one percent cobalt acetate in methanol with 2/ioths of a milliliter of glacial acetic acid. This is in one of the solutions. You have another solution made of five percent isopropylidene in methanol. You put a little of both of these into a little depression well spot plate, scrape a little bit of the tablet or, in this case, squeeze a little bit of the capsule in there and a blue to bluish purple color is an indication that a barbiturate is present.
“THE COURT: All right. Then you spoke of an ultra-violet test. What is that?
“A. This involves taking a capsule and doing an acidic extraction to remove the barbiturate from these other filler materials if they are present. Then it is extracted into a solution put into this machine, an ultra-violet spectrophotometer. Ultra-violet light is beamed through and according to how much light is absorbed on different wave lengths that comes out on a spectrum like this — see here we’ve got 300 manometers and we’ve got peak absorbance of 254 and so on. That’s an indication a barbiturate is present. Then by making the solution basic and running it again, we get a peak shift which is a more conclusive indication that a barbiturate is present but it does not differentiate between types of barbiturates. So in a P.D.R. color test and a U.V. or ultra-violet there are indications that barbiturates are present. Then the last test is the infra-red spectrophotometry examination which involves taking the powder, extracting it and putting it in chloroform, evaporating the chloroform then you have a pentobarbital powder. Then you make this into a pellet and this solid, which looks like a tablet or something, except it’s almost clear is put in front of a beam of infra-red light and again, according to how much absorbance you get over different wave lengths of light, you get the spectrum. Then the spectrum is calibrated about a specific thing and then it is compared with known spectra in the literature for pentobarbital and a determination is made and it is specific for the particular barbiturate and is one of the most specific tests' known, the infra-red is.”
The evidence as to the custody and possession of the capsules unequivocally shows there is no missing link in the chain of identification. Identification and continuity of possession were sufficiently established, affording ample assurance of the authenticity of the capsule and the analyses conducted in the laboratory of the Toxicolo *1046 gist. Powell v. State, 47 Ala.App. 582, 258 So.2d 923; Dennison v. State, 259 Ala. 424, 66 So.2d 552; Green v. State, 42 Ala.App. 439, 167 So.2d 694.
Appellant contends that the person who conducted the laboratory analyses on the capsules was not qualified to render an opinion as to the contents thereof. We do not agree.
The criterion for the admission of expert testimony is that the witness, by study, practice, experience or observation as to the particular subject, should have acquired a knowledge beyond that of ordinary witnesses. Whether a witness is shown to possess the requisite qualifications is a preliminary question largely within the discretion of the Court. Kitchens v. State, 31 Ala.App. 239, 14 So.2d 739; Grant v. State, 46 Ala.App. 232, 239 So.2d 903; Woods v. State, 54 Ala.App. 591, 310 So.2d 891; Rupert v. State, 54 Ala.App. 578, 310 So.2d 501.
There was no error in allowing the undercover agent to state that the green grassy material he observed on the table in front of appellant “appeared to be marihuana.” Carmichael v. State, 48 Ala.App. 748, 267 So.2d 538.
There was no error in the action of the trial court in excusing juror Jacobs over the objection of appellant. Mrs. Jacobs stated she had three small children at home and no one to care for them. As soon as this juror was excused another name was drawn from the jury box to take Mrs. Jacobs’ place and appellant was afforded the proper number of strikes. In Williams v. State, 51 Ala.App. 1, 282 So.2d 349, this Court held that the trial court has broad discretion in relation to excusing jurors for any reasonable or proper cause. We further held in Williams, supra, that a defendant has no constitutional right to a trial by any particular jury or jurors, but only a right to a trial by a competent and impartial jury. We hold the trial court did not abuse his discretion in excusing juror Jacobs.
Appellant testified in his own behalf and denied the testimony of the undercover agent that he sold the agent any capsules. This conflict in the testimony presented a question for the jury as to the guilt of the defendant. The jury resolved this conflict against appellant. Jones v. State, 54 Ala. App. 251, 307 So.2d 59.
During cross-examination of appellant the following occurred:
“Q. And isn’t it true you were pushing a lot of dope out there?
“A. No, sir.
“MR. PARKER: I move to exclude it.
“THE COURT: Overruled.
“MR. PARKER: I move for a mistrial.
“THE COURT: Overruled. Ladies and gentlemen, when I overrule, did I overrule? Or sustain? In any event, strike it from your minds, it is not material to this case.”
The question asked by the prosecutor was improper, but appellant answered the question negatively. A negative answer to an improper question does not constitute reversible error. Hurst v. State, 54 Ala.App. 254, 307 So.2d 62; Stephens v. State, 250 Ala. 123, 33 So.2d 245; Leonard v. State, 36 Ala.App. 397, 58 So.2d 138.
At any rate the trial judge instructed the jury to disregard the prosecutor’s question.
Further, on cross-examination the prosecutor asked appellant if he had ever been convicted of a felony and before any objections could be interposed appellant answered, “Yes, sir.” Under Barnett v. State, 52 Ala.App. 260, 291 So.2d 353, this Court held that an objection after an answer is made comes too late.
Appellant filed a motion for a new trial and the motion was overruled and denied.
We have repeatedly held that in reviewing the refusal of a motion for a new trial this Court will indulge every presumption in favor of the correctness of the decision of the trial court. Clark v. State, 54 Ala.App. 217, 307 So.2d 28; Moore v. State, 52 Ala.App. 179, 290 So.2d 246; Johnson v. State, 51 Ala.App. 172, 283 So.2d 624.
*1047 In Young v. State, 283 Ala. 676, 220 So.2d 843, the Supreme Court held:
“Where the evidence presented raises questions of fact for the jury, and such evidence, if believed, is sufficient to sustain conviction, the denial of a motion to exclude the state’s evidence, the refusal to give the affirmative charge and the overruling of a motion for new trial, does not constitute error. Drummond v. State, 37 Ala.App. 308, 67 So.2d 280; Wade v. State, 24 Ala.App. 176, 132 So. 71.”
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
TYSON, DeCARLO and BOOKOUT, JJ., concur.