[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 26 
Murder; life.
Craig R. McLaren was indicted by the Madison County Grand Jury in November, 1975 and was charged with unlawfully killing Dorothy G. Traylor.
On December 10, 1975, the appellant filed four motions at trial, one of which was a motion for a change of venue. An evidentiary hearing was held and the motions were denied.
The case was called for trial on May 11, 1976, and at that time the appellant filed a motion to quash the indictment. Counsel for the appellant maintained that there had not been sufficient evidence presented to the grand jury on which an indictment could be based. After a hearing outside the presence of the jury, the court determined that, although the indictment rested on hearsay evidence, it was sufficient under the law and the motion was denied.
The evidence presented at trial showed that Dorothy Giles Traylor was married to *Page 27 
Edward E. Traylor and they lived at 615 Franklin Street in Huntsville, Alabama. On September 6, 1974, Mr. Traylor, after eating breakfast with his wife, left for work. Traylor testified that he did not talk with his wife during the day but that she had called his store around 12:30 P.M. Traylor stated that he arrived home between 4:00 and 5:00 P.M., discovered blood on the door of a porch and in the kitchen, and called the police. He said that the next time he saw his wife was at the funeral home where her body had been taken.
On September 6, 1974, about 5:30 P.M., Richard Yearick, a Huntsville Policeman, was called to a wooded area off Miss Ann Road on Monte Santo Mountain. On his arrival he saw the body of a white female lying face down. The body was covered with blood and appeared to have been stabbed. Leaving the scene where the body was found, Yearick went to an area off Knotty Wall Road in Huntsville, Alabama, and found a 1970 Cadillac belonging to Mrs. Traylor. According to Yearick, approximately three weeks later, in response to a call, he went to the residence of Tommy Barry. There a wallet was turned over to him containing several credit cards, blank checks, a social security card with Mrs. Traylor's name on it, and various other notes and photographs.
Robert B. Johnson, a State toxicologist, examined the remains of Mrs. Dorothy Traylor on September 7, 1974, at the Huntsville morgue. He found some twenty-eight lacerations, eleven or twelve being puncture lacerations which are ordinarily described as stab wounds. Johnson stated that "the subject died as a result of shock and hemorrhage from multiple puncture lacerations, mainly to the back of the body." According to Johnson, a laceration on the head was caused by, "some sort of blunt instrument, the others were made by a sharp instrument."
Eugene Bonner, Jr., an ex-marine and a veteran of the Vietnam war, was married and had one daughter. Prior to the incident, he was separated from his wife and working at NASA doing his apprenticeship for a mechanical engineer.
Bonner admitted that he had been previously convicted for child abuse and sentenced to five years, and while on probation was charged with armed robbery. A plea of insanity had been entered in the robbery case, and he was awaiting trial on that charge when the present trial was begun.
Bonner recalled that he was walking down the street when he first met McLaren, who, according to Bonner, was driving a little red Karmen Ghia. McLaren asked him if he wanted to smoke a joint of "marijuana." Afterwards they "started talking and playing chess together." Bonner recalled going to the appellant's house located "right up from the Automatic Electric" and, on one occasion, having seen his wife there.
According to Bonner, on September 6, 1974, he saw appellant about ten o'clock that morning at his house. He said that they talked and played chess but then left and went to McLaren's house. Bonner testified that while they were there the appellant asked "if I wanted to make forty or fifty thousand dollars. I asked what did we have to do, he said we were going to kidnap this lady and take her to the bank for some money." When Bonner responded that he did, they went outside to the garage and McLaren "got a 38 and a military K-bar, which was a knife like a bayonet." Bonner recalled that McLaren placed the knife and the gun inside his pants and that they then left in the red Karmen Ghia. They went to a store where the appellant purchased some rubber gloves.
From there they drove to a location near some doctors' offices, three or four hundred yards from the Traylor house. After parking the car they proceeded to walk to the victim's house and as they were going up to the house, they passed an elderly black lady. They knocked on the door and McLaren asked about cutting the grass. Mrs. Traylor said they "would have to take it up with her husband." At that point, they walked through an alley to the back of the house. Again, McLaren knocked on the door and when Mrs. Traylor opened the door he *Page 28 
asked her about cutting the grass. She again repeated that "they would have to talk to her husband" and closed the door. McLaren knocked the third time and when Mrs. Traylor opened the door again, he knocked her into the house and said, "be quiet bitch." She started screaming and McLaren hit her on the head with the gun. The blow caused bleeding which could not be stopped. McLaren said, "we're not going to be able to take her to the bank." Mrs. Traylor then asked "what are you going to do?" and he replied, "we're going to let you go."
They tried to stop the bleeding. According to Bonner, they attempted to wipe the blood from the floor because of tracks made in the blood. Next they carried Mrs. Traylor to the back seat of her Cadillac which was parked at the back of her house. McLaren sat in the back seat, with the victim lying on the floorboard, while Bonner drove to the mountain and backed the car inside a clearing.
Mrs. Traylor got out on the left side of the car with McLaren behind her. According to Bonner she was facing him at the time and appellant stabbed her five or six times in the back. When she fell, McLaren "cut her throat . . . Vietnam style . . . the style that is used in Vietnam, quick style, quick death." Bonner said they had gloves on at the time and afterwards appellant wiped the knife on his pants and they left Mrs. Traylor's body on the mountain.
Bonner recalled that they drove down across the mountain onto "old Big Cove Road" and were following a bus. "The car was kind of bloody" and when they came to a location near "Owens Cross Road" they threw the victim's purse from the car. Subsequently, they left the car on the side of the road and walked across the mountain where they left the gun and knife near a telephone pole. Afterwards they were given a ride in a van to the corner of the road where the "Auto Electric" was located. They went to a store and got something to drink and from there went to the appellant's house and drank some scotch. Subsequently, they left McLaren's house in his wife's car and returned to the area where the knife and gun were located. From there they went to where the appellant's car was parked near the Traylor home, and drove the two cars back to McLaren's house. According to Bonner, he did not hear from appellant again for about a week.
Bonner said that he called the appellant and was told not to worry and not to say anything. According to the witness, he went to McLaren's house and appellant told him not to come there anymore because he had been picked up by the police and let go because "they didn't know it was him." That was the last communication that he had with the appellant.
During cross-examination, Bonner admitted that after he left Vietnam he heard voices and had been to the veteran's hospital on two occasions. He recalled that Drs. Able and Miller told him that "every thing was going to be alright." He said that the doctors had talked to him and given him some medication which he was still taking. Bonner also admitted that on hearing the voices that he had on occasion talked back. He explained that he could not understand where the voices were coming from and wanted to ask them (the voices) where they were. Further, Bonner said the voices were coming from "out of my mind."
Bonner admitted that he was told that if he signed a statement that he would not be prosecuted but denied he was told he would get the five thousand dollars' reward.
Bonner also stated that the statement appearing in the newspaper was substantially the same as the one he had given to the police. He went on to testify that his wife had called and told Mr. Traylor about his participation in the alleged murder. Further, he admitted that some fourteen months had passed and he had done nothing and that it was his wife who had told the authorities of his participation.
Upon further questioning, Bonner acknowledged using heroin and LSD while in Vietnam and having "flashbacks." Also he admitted that Dr. Miller's report indicated *Page 29 
that he should go to Bryce's Hospital and have a full scale in-hospital evaluation, but that he went to the VA hospital instead.
Thomas R. Hall was employed at the Tidwell Grocery at the time of the alleged murder in 1974. He stated that the grocery store was located about two blocks from the Traylor home and that on September 6th he recalled seeing a black man and a white man in the store. According to Hall, the white man had dark blonde hair that came down to his shoulders and that he was positive that it was the defendant who was with the black man. Further, he said that it was the appellant who purchased rubber gloves on that date.
Don Adams, on September 6, 1974, was at a doctor's office on Franklin Street. He testified that on that day he saw a black man and a white man drive a Karmen Ghia into the parking lot at the doctor's office. He recalled that the car they were driving had "paint-primer sprayed all over it which was dark red or brown in color." He went on to say that the white man hand long blonde hair and that he believed the defendant was the man driving the car. During cross-examination, he said that he did not get a good look at the black man but said that he was positive that the appellant was the person he had seen driving the car.
Christine Falt stated that about "2 o'clock" on September 6, 1974, she saw a black man and a white man at an intersection which was one or two houses from where the Traylor home was located. The two were standing on the street corner. She said she was absolutely positive that the white man was the appellant but that his hair was longer at the time.
During cross-examination, she said that she did not notice the black man at the time but had no doubt whatsoever that the appellant was the one she had seen on that occasion. She explained, "I looked him straight in the eye."
Jimmie Jones was employed by Mrs. Traylor as a maid, she recalled that on the day in question she had left work a little after two o'clock and had gone out the back door. She stated that she was going out the driveway and saw a colored boy and a white boy but did not see them long enough to make an identification.
Ollie Hatchett was a gardener at the Caldwell residence which was located at the back of the Traylor home. He recalled that on September 6, 1974, he was working near the back of the Traylor home when he observed a black man standing near the back of the victim's house. He said the back door of the Traylor home was open at the time and when he heard a scream he saw the black man run in the back door. Subsequently, he saw the black man and a white man put something in a blue and white Cadillac parked at the rear of the house. He stated that the white man got in on the passenger side of the car and that the black man got in on the driver's side and also that they drove off at a high rate of speed with the headlights on.
According to Hatchett, he did not call the police because he "didn't think anything was wrong."
During the questioning, Hatchett indicated that he could not make an identification.
Janice Fowler, on September 6, 1974, had gone to pick up her children at school. It was about 2:30 P.M. and as she was traveling up "Big Cove Road" she saw a late model blue and white Cadillac driven by a "black boy." A "white boy" was sitting directly behind him in the back seat. She stated that she could not describe the black but did say that the white "had maybe shoulder length hair and it was light in color."
Maples Moon was the driver of a school bus on September 6, 1974, and recalled seeing a Cadillac behind the bus. The car followed the bus for about five miles with its headlights on. He recalled that a "colored boy" was driving and a "white boy" was sitting on the passenger side. Moon stated that he could not identify either one.
Lisa Hillis was riding the school bus on that day and recalled seeing a Cadillac with its headlights on. She said she believed that the car was being driven by a "colored *Page 30 
guy" and that a "white guy" was sitting beside him. She said that the Cadillac was behind the bus at the time, and stated that she could not identify them.
Demetris Hillis was also a passenger in the bus on September 6, 1974 and remembered seeing the Cadillac behind the bus. He said the lights were on at the time but could not describe the car. Further, a black man and a white man were in the car but he could not identify either one.
Maxine Hillis, the mother of Demetris Hillis, lived on Green Mountain Road, a dead-end street with approximately ten or twelve houses. She recalled that on September 6, 1974, she saw a blue and white Cadillac, with its lights on, drive onto the street, turn around and start to back out when a school bus came into the street.
Roy Thompson was employed at "ITEC Incorporated" located on "Green Cove Road at the foot of Green Mountain," about one half of a mile from Pitsinger's Grocery Store. On September 6th he gave "a white and a black" a ride in his panel truck. The "white had long blonde hair and the two got out at Pitsinger's store. During cross-examination, Mr. Thompson said that he was not positive what he had testified to had occurred on September 6, 1974.
J.B. Pitsinger, the proprietor of a general merchandise store in Huntsville, Alabama, recalled that on September 6, 1974, a black boy and a white boy came into his store: "The black boy had a mustache and a goatee and was sort of thin looking. The white boy had long hair, shoulder length." He said that they bought cold drinks and that the appellant was one of them. Further, that the appellant had "been in the store a lot."
During cross-examination, he said that he was positive that it was September 6, 1974, when the two came into his store; "the weather was hot and they were sweating."
Melisa Voit was the appellant's former wife who had divorced McLaren some two months before the trial. She testified that on September 6, 1974, she had gone home about 4:00 P.M. She had a "Fiat automobile" and her husband, the appellant, drove a Karmen Ghia. Voit identified a picture showing appellant with long hair and said she had taken the picture while they were in South Carolina. She recalled that on September 6, 1974, she saw the appellant shortly after she got home from work. He came in, asked to borrow her car and told her he was going to drive "Eugene Bonner" home. She remembered that a week after the alleged murder she had seen a composite drawing on the news that looked "like Craig," (the appellant). When questioned she said, "he didn't know anything about it." After their divorce she had a conversation with him in the jail and he told her "that he and Eugene (Bonner) had been together and that it happened, except that he didn't kill Mrs. Traylor. He said that Eugene did it." She stated that the appellant told her that "about four or five black men threatened me and my dog if I didn't go along with him."
During cross-examination, Voit denied that her husband, the appellant, found her in bed with Ed Stiegner, a soldier stationed at Red Stone Arsenal. She explained that Stiegner had his clothes on and that he was helping her box up her furniture and belongings.
Further, when questioned, she replied, "I don't have any prejudice against him (McLaren)."
At the end of Melisa Voit's testimony, the State concluded its case and the defense made a motion to exclude the evidence. Counsel cited as grounds that the evidence was based on the uncorroborated testimony of the accomplice and that there was no evidence of a substantial nature to materially connect the defendant with the commission of the offense.
Henry B. Abele was the first witness called by the defense. He stated that he was a medical doctor, practicing in the field of psychiatry. He said that in March or April of 1976, he saw Eugene Bonner on two occasions. During those visits, the doctor stated, "there is no doubt that he (Bonner) has been fencing with us." As a result of those two interviews the doctor *Page 31 
recommended that he (Bonner) be sent to Bryce's Hospital for further examination.
Alton Hovis, a sergeant with the Madison County Police Department, worked in the county jail and stated that on May 5, 1976, Bobby Owens, one of the jailors, told him that Bonner was throwing stuff in the cell and "kind of looked wild out of his eyes." Hovis said that Bonner was placed in a padded cell until about after eleven that night and the next morning released from jail.
Bobby Owens testified that he was the assistant jailer who had taken Bonner to Mr. Hovis after Bonner had been throwing things in his cell. His testimony was substantially the same as that given by Mr. Hovis.
Craig R. McLaren was called as a witness in his own behalf and stated that a white man named Gerald brought Eugene Bonner to his house around the middle of August. He said that he could not say exactly where he was on September 6, 1974, but denied that he was implicated or participated in the murder of Dorothy Traylor. He admitted talking to his wife in jail but denied telling her about the case. He said, "I don't know where she came up with that story." He maintained that he did not tell his wife the things she had said that he told her.
McLaren stated that on May 25, 1975, he came home and found Ed Stiegner in bed with his wife and that he "smacked him" and Stiegner ran out of the house. On cross-examination, McLaren was asked: "What was Gerald's last name?" and he replied, "I don't know." He said that he had met Gerald about the middle of July when he had come over to his house trying to sell him some "controlled substances."
Appellant denied that he had met Eugene Bonner in downtown Huntsville, and said that he had not played chess with him. Further, he denied asking his wife to come to the jail. He said that she had come to the jail "on her own," but they did not discuss the Traylor murder case.
McLaren admitted being in Pitsinger's General Store several times but denied buying any gloves in the store on September 6, 1974.
At the end of appellant's testimony the defense rested and the State called Officer Howard Turner in rebuttal. He said that shortly after Mrs. Traylor's murder he stopped the appellant and he was driving a red Karmen Ghia at the time. He recalled that the appellant had long hair and that he saw a hunting knife in the trunk of the car. Turner went on to say the knife handle was wrapped with black tape and was about an inch and one-half to two inches wide and eight to ten inches long.
On cross-examination he said he did not remember the knife "being a military K-bar type."
The last witness to testify in the case was Clem Cartron, the appellant's former wife's attorney. He stated that he had accompanied the appellant's former wife, Melisa Voit, to the jail and that she had requested to see her husband.
 I
Counsel for appellant contends that the trial court's failure to grant a change of venue was error.
Prejudicial pre-trial publicity may be a ground for a change of venue under T. 15, Section 267, Code of Alabama 1940, Recompiled 1958: Butler v. State, 55 Ala. App. 421,316 So.2d 348. However, the defendant in a criminal case has the burden of showing there was such prejudice prevailing in the community where his trial was set that a fair and impartial trial could not be had. Boutwell v. State, 279 Ala. 176, 183 So.2d 774.
Newspaper articles alone would not necessitate a change of venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639,21 So.2d 844.
Also, matters involving change of venue are discretionary with the trial court *Page 32 
and their decision will not be disturbed on appeal unless there is an abuse of that discretion. Hurst v. State, 54 Ala. App. 254, 307 So.2d 62; Moore v. State, 52 Ala. App. 179,290 So.2d 246.
It is averred that the article appearing in the mast-head position in a local newspaper, containing an alleged "confession" and "eyewitness," account of how the defendant murdered Dorothy Traylor, so permeated the community with prejudice toward the appellant as to preclude a trial consistent with due process.
Even though newspaper articles had been given prominent space concerning the alleged offense, and the arrest of alleged defendants who were indicted, a change of venue was unnecessary. Jordan v. State, 56 Ala. App. 55, 318 So.2d 793.
The articles contained in the record appeared to be factual and fair. They do not appear to have been intended to prejudice the citizenry against the appellant.
The only evidence produced by the appellant on this question came from the defense counsel. He stated in an affidavit that he had talked to at least fifty or sixty people about the homicide and that ". . . all expressed the opinion that . . . the defendant, Craig McLaren, was guilty." No other evidence was produced in support of the motion.
In our judgment the appellant did not carry his burden of supporting the motion for a change of venue to the reasonable satisfaction of the court. Pryor v. State, 47 Ala. App. 706,260 So.2d 614; Yoemans v. State, 55 Ala. App. 160, 314 So.2d 79;Flurry v. State, 52 Ala. App. 64, 289 So.2d 632.
Under the facts in the present case the trial court did not abuse its discretion in denying the motion for a change of venue.
 II
The appellant insists that the trial court erred in denying appellant's motion for a copy of the alleged confession made by Eugene Bonner, as reported in an article appearing in the Huntsville News on November 17, 1975.
After an evidentiary hearing on December 18, 1975, the motion requesting production of the statement by the accomplice, Bonner, was denied, and the court in its decree said:
 ". . . the Court is of the opinion that the information which Defendant seeks is already available to Defendant from Defendant's own knowledge or from sources available to Defendant."
Further, it said the motion was well taken and should be granted as to any information which the district attorney's office had in its files which would aid or benefit the defendant in his defense or tend to exonerate him.
No absolute right to pre-trial discovery of a statement made by an accomplice to the police, implicating the defendant as the perpetrator of the crime charged, exists in Alabama. Some of the cases from other states have held that no such right exists. See State v. Brown, 360 Mo. 104, 227 S.W.2d 646; Leahyv. State, 111 Tex.Crim. R., 13 S.W.2d 874; State v. Mitchell,258 La. 427, 246 So.2d 814; State v. Curry, 262 La. 616,264 So.2d 583.
In these cases unless the defendant shows an important reason to discover the contents of an accomplice's statement, such as to impeach the testimony of a witness or to uncover evidence tending to exonerate the defendant or aid in the preparation of his case, then generally the discovery is not allowed.
Under the cases cited above, it is our judgment that the appellant was not entitled to the discovery sought unless he could show that one of the important reasons outlined existed.
This court in Cooks v. State, 50 Ala. App. 49, 276 So.2d 634, outlined certain requisites necessary for the inspection and production of witnesses' statements: First, that the statement must be in writing, prepared by him or prepared by another at his insistence and signed by him or otherwise authenticated by him; second that presentation of evidence showing that the statement made *Page 33 
by the witness to the officers before trial differed in any respect from statements made to the jury during trial; third, a showing that the statement requested was of such a nature that without it the defendant's trial would be fundamentally unfair.
The record did not indicate a prior inconsistent statement by the accomplice existed. Further, no attempt was made to introduce any statement by Bonner during the trial. The only account before the jury of what Bonner said occurred during the day in question came in his testimony at trial. The appellant's counsel thoroughly cross-examined him and had an ample opportunity to question him concerning any alleged prior inconsistent statements.
It is noted that the statement appearing in the newspaper was substantially the same as that Bonner made during the course of the trial. We do not believe that the appellant was entitled to the so-called confession by Bonner because it failed to show or meet the criteria set out above.
 III
It is maintained that the trial court committed error when it denied the defendant's motion to quash the indictment. Counsel argues that no witnesses, before the grand jury, gave testimony as to any facts to implicate the defendant or connect him with the commission of the crime. Further, he contends the reading of the alleged accomplice's statement to the grand jury, without Bonner being present or his absence being explained, was not "legal documentary evidence." Counsel insists that the law requires the grand jury to have either a witness or documentary evidence before it.
Title 30, Section 86, Code of Alabama 1940, Recompiled 1958, states:
 "In the investigation of a charge for any indictable offense, the grand jury can receive no other evidence than is given by witnesses before them, or furnished by legal documentary evidence. . . ."
Also, the law is clear that an indictment may rest on hearsay evidence. Armstrong v. State, 294 Ala. 100, 312 So.2d 620;Costello v. United States, 350 U.S. 359, 76 S.Ct. 406,100 L.Ed. 397. Further, it is well established that no inquiry into the sufficiency of such evidence would be indulged. Crowden v.State, 41 Ala. App. 421, 133 So.2d 678.
In the present case, the record shows that the chief assistant district attorney and Detective Turner gave testimony before the grand jury concerning the investigation of this case and that the testimony was based on the statement made by Bonner. It is judgment that the grand jury had competent evidence before it and the testimony comported with the requirement of T. 30, Section 86, supra. Whether this evidence was sufficient cannot be questioned. Crowden v. State, supra.
See: Douglas v. State, 42 Ala. App. 314, 163 So.2d 477, reversed on other grounds, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934.
 IV
The appellant asserts that the trial court unduly limited his cross-examination of the State's witnesses. Specifically, he says that he made repeated attempts to cross-examine Bonner concerning Bonner's alleged attempt to kill himself, and, second, he attempted to cross-examine appellant's ex-wife, Melisa Voit, in an effort to show her bias and prejudice toward the appellant.
Although Alabama follows the English Rule of unlimited cross-examination, Ball v. State, Ala.Cr.App., 337 So.2d 31, such cross-examination does not extend to wholly collateral or irrelevant matters. McDonald v. State, Ala.Cr.App.,340 So.2d 103. Discretionary power to limit cross-examination still rests with the court and such discretion will not be considered abusive when it has been shown that the cross-examination was curtailed because it; one, was repetitious; two, wholly concerned collateral matters; three, was irrelevant; or four, harassing, annoying or humiliating. Ball v. State.
Great latitude is allowed in cross-examination in order to develop a witness's *Page 34 
bias. Even so, the trial court has reasonable discretion in confining examination to prevent diversion to outside matters.Jackson v. State, 272 Ala. 566, 133 So.2d 210.
The present record indicates that wide latitude was allowed the appellant in his questioning of Bonner and Voit. In our examination of the transcript, the evidence shows that appellant's cross-examination was curtailed only on irrelevant matters.
Whether Bonner attempted to get Gail Binford to kill him or threatened to kill himself, under the circumstances, was irrelevant.
Also, the evidence concerning whether the appellant's ex-wife was found in bed with another man, evidence which was introduced to show her prejudice and bias toward appellant, was irrelevant. The events asserted to be the subject of the prejudicial attitude of the ex-wife occurred after the alleged murder and two months after the divorce. How this exemplifies prejudicial attitude under these facts was not shown.
In our judgment, the trial court did not abuse its discretion and cross-examination was not curtailed on any relevant matters.
 V
It is alleged that appellant's motion to exclude the evidence should have been granted because the testimony by the accomplice, Eugene Bonner, was not corroborated.
The law of Alabama says in essence that a conviction for a felony cannot be maintained on the testimony of an accomplice alone unless corroborated by other evidence tending to connect the defendant with the commission of the offense charged. T. 15, Section 307, Code of Alabama 1940, Recompiled 1958. Whether sufficient evidence is adduced at trial to corroborate the accomplice's testimony is a preliminary question for the trial judge. Leonard v. State, 43 Ala. App. 454, 192 So.2d 461; Smithv. State, 230 Ala. 413, 161 So. 538. Under Sorrell v. State,249 Ala. 292, 31 So.2d 82, the trial judge, in analyzing the accomplice's testimony, is required to lay his testimony aside and then determine whether the remaining testimony tends to connect the defendant with the commission of the crime. Dobbinsv. State, 45 Ala. App. 190, 227 So.2d 820. The evidence required in corroboration of accomplice's testimony may be direct or circumstantial. Pryor v. State, supra. The weight and sufficiency of such evidence are questions for the jury. Hornv. State, 15 Ala. App. 213, 72 So. 768; Miller v. State,290 Ala. 248, 275 So.2d 675.
In the present case the evidence presented in corroboration of Bonner's eyewitness account, included: (1) testimony by the appellant's former wife that appellant said he was present when Mrs. Traylor was killed; (2) testimony by Thomas Hall that the appellant and the accomplice bought "Playtex" gloves from him at the store located near the victim's home on the day she was killed; (3) testimony by Don Adams and Christine Falt tending to show that the appellant and the accomplice were in the vicinity of the victim's home on the day she was killed.
In our judgment, when these facts are examined in the absence of the accomplice's testimony, they are more than sufficient. It is clear that from this corroborative evidence it can reasonably be inferred that the defendant was connected with the murder.
Under these facts, the trial judge was justified in denying the motion to exclude, and submitting the question to the jury.
 VI
Appellant averred that to require him to make bond when the case was submitted to the jury, after he had been released on his own recognizance throughout the trial, indicated the trial court was biased and prejudiced against him. Counsel insists this action by the trial court was error.
The law pertaining to the undertaking of bail is stated in T. 15, Section 206, Code of Alabama 1940, Recompiled 1958; which reads: *Page 35 
 "The court, before which any defendant is bound to appear, may require him to enter into a new undertaking, when it appears to the court that the original undertaking was insufficient when entered into, or has since become insufficient from any cause whatever."
Under the law in Alabama involving capital offenses bond may be constitutionally denied where the proof is evident or the presumption great. Ex parte Bynum, 294 Ala. 78, 312 So.2d 52.
In our judgment, the appellant in the present case was not deprived of a fair trial by the action of the trial court in requiring bond when the case was submitted to the jury.
The transcript indicated that the trial court took every precaution to prevent the jury from knowing of the bond requirement. The trial judge explicitly required the appellant to be allowed sufficient time before trial the next morning to shave and dress in fresh clothes. Further, he ordered the appellant be brought into court without handcuffs and that the guard attending him be dressed in civilian clothes and sit outside the rail.
It was not unreasonable for the trial judge to require bond at this late stage in the trial. From the facts presented at trial it could reasonably be inferred that the defendant was guilty of the crime charged and the likelihood of his returning to court was not as great as it was before the trial began.
Under these circumstances, we fail to see any merit in the appellant's argument.
 VII
Counsel for appellant complains that the trial court unduly confused the jury by charging them as to the law of conspiracy.
It is apparent from the testimony that Bonner was the appellant's accomplice in the commission of this homicide or, if the appellant's version of the alleged offense is believed, that he was Bonner's accomplice. Under either version of the testimony the trial court was correct in instructing the jury on conspiracy.
 VIII
It is contended that the court erred when it denied the defendant's motion for a new trial.
The matter of granting a motion for a new trial rests within the sound discretion of the trial court, and on review every presumption in favor of the correctness of the trial court's decision will be indulged. Jones v. State, Ala.Cr.App.,339 So.2d 1042; Binion v. State, 57 Ala. App. 234, 327 So.2d 729. Only where the preponderance of evidence against the verdict is so decided as to show that the verdict is wrong and unjust will the trial court's decision overruling the motion be reversed.Colston v. State, 57 Ala. App. 4, 325 So.2d 520.
Under the facts in this case we cannot say that the verdict was so patently against the weight of evidence as to convince us that it was wrong and unjust.
Since there is no error in the record, this case is
AFFIRMED.
All the Judges concur.