This is an appeal from a judgment of conviction and sentence to life imprisonment for murder. A jury found this appellant guilty as charged in an indictment with intentionally causing "the death of another person, Frances Neely, by shooting her with a pistol, in violation of Section 13A-6-2 of the Code of Alabama, subsequent to . . . the effective date of said Section 13A of the Code of Alabama." The court fixed defendant's punishment at imprisonment for life and sentenced him accordingly.
By reason of defendant's indigency, he was represented by trial counsel appointed to defend him and who continued to represent him until he was sentenced, at which time defendant gave notice that he would appeal the judgment of conviction and sentence. The court then advised him that it would promptly appoint different counsel to represent him on appeal from counsel who had represented him on the trial, which the *Page 778 
court did and which appointed counsel timely filed a motion for a new trial and represented defendant on the hearing of said motion, at which considerable testimony was taken. The trial court overruled the motion for a new trial, which ruling constitutes one of the issues presented on appeal.
No issue is presented by appellant as to whether the evidence was sufficient to present a jury question as to defendant's guilt. Furthermore, appellant presents no issue on appeal as to the sufficiency or the weight of the evidence as to defendant's guilt. However, as two of the issues presented by appellant could reasonably be affected by the sufficiency or the strength of the evidence as to defendant's guilt, we will give a brief resume of the evidence pertaining directly to his guilt or innocence.
At about 3:45 P.M. on December 14, 1981, the victim was killed while in her home at Paint Rock, Alabama. A neighbor had heard a shot, and soon thereafter another neighbor of the victim entered the victim's house and saw that she had been recently killed, that there was much blood on and about her body and signs of considerable violence. Law enforcement authorities were speedily alerted. The first officer to arrive at the scene was Deputy Sheriff Freddy Hall, who observed some onlookers and told them to move back from the premises, and then he secured the scene, including the inside of the house and parts of the outside and adjacent areas, to prevent any entrance or exit. He learned that an ambulance had been called and was informed by ambulance attendants that they had been in the house. Mr. Brent Wheeler of the Alabama Department of Forensic Sciences testified that he took part in the investigation of the residence of the victim on the night after she was killed and that he recovered a bullet from the "sub-flooring" in the northwest room of the house of an "approximate 44 caliber," which he identified as an exhibit on the trial and which was admitted in evidence. He said that in his opinion the bullet was one that could be fired only from a "Smith Wesson 44 special or 44 Magnum."
Numerous photographs were taken of the residence of the victim, the interior of the house and many objects therein, including the body of the victim that showed what appears to be a bullet wound that penetrated the upper part of her chest and several marks and crushing wounds on her head, which according to the testimony of one or more expert witnesses, resulted in the fracture of her skull. According to the undisputed evidence, the body of the victim was lying on a door of the house which had been pulled down from its hinges and was largely covered with blood, and underneath the upper part of her body there was a hole in the door immediately above a hole in the flooring directly above the place where the bullet referred to above was found. According to further undisputed evidence, the defendant lived with his wife in a mobile home or trailer within a short distance of the residence of the victim, and he was at his home part of the day of her death.
The witness who first found the body of the victim testified that as she entered the victim's house she heard a noise that sounded like a gunshot and saw someone wearing a mask run by her and out of a back door. She said the person was bent over and was under six feet tall. She could not identify the person as the defendant. Police Officer Edward Cain, Jr., who had been assigned to the canine unit, testified that he and his dog, Dozer, arrived at the scene of the crime, that his dog followed several trails from the victim's backyard and that one of these trails led to the mobile home of the defendant, but upon reaching such property the officer's dog became more interested in other dogs than in tracking and trailing. A neighbor of the victim and of the defendant testified that some time between 9:30 and 11:30 A.M. of the day of the homicide, she saw defendant walking down the street wearing blue jeans, a black football jacket, and tennis shoes, and that she saw him again at the time the sirens were heard relative to the homicide and he drove from his home very fast and that she afterwards saw him in the victim's yard that night, and he told her then that when he left his house that afternoon he had changed direction *Page 779 
from which he had started and had turned around, because "they" would not let him go in the direction he had headed. She further testified that he said "This is terrible to happen in your own back door . . . this makes me sick at my stomach; I'm going to go home" and then he left. She said that he was wearing different clothes from the clothes he was wearing during the morning of that day, that he had on a red windbreaker and baseball cap. Another witness testified she saw the defendant on the morning of December 14 and then he was wearing tennis shoes and that she saw him that night in the yard of the victim's house and that he then had changed his footwear from tennis shoes to slippers.
According to the testimony of State Investigator Sgt. Louis Mewbourn, he and three other officers went to the mobile home of defendant on the night of December 14, 1981, after he had been at the scene of the crime, and found the defendant, defendant's wife and young daughter at home. He went to question the defendant and view his home and its contents. He apprised the defendant of his mission. The defendant was cooperative and readily gave his permission for the officer to search his home. He was fully advised of all of his constitutional rights and freely answered questions as to his whereabouts the day of the homicide, after voluntarily signing a waiver of rights form. He was asked by the officers to let them see his .44 caliber pistol. He replied that he had previously owned a .44 caliber pistol but that two years before he and his stepbrother had gone target shooting down by the river with the pistol, that his stepbrother dropped the pistol into the river, that they tried to find it but could not do so. Defendant stated that he had sat around the house for most of the day on December 14, that his wife had gone to Huntsville that morning and returned about noon, that he decided to go deer hunting and took his 30-30 rifle with him and did not return until about 4:00 or 4:30 P.M. and that upon returning home he heard the sirens. He said he attempted to drive to a store but could not get through to it and turned around and went in the opposite direction to a store in Paint Rock, where he was informed that Mrs. Neely had been killed or was shot.
On the late afternoon or evening of December 15, the day after Mrs. Neely was killed, an officer went to the home of the defendant and asked him and his wife to come to Scottsboro to be there questioned in an official office. They agreed to do so. In the course of the interrogation in Scottsboro, defendant signed a written permission for his house and premises to be again searched and delivered to them the key to the house. A search of the house was made that night. Among other items, a pair of tennis shoes that "were damp and looked like something that had come out of the washing machine" were found and introduced in evidence. They found some fingernail clippings within the bag of the carpet sweeper, which were also introduced in evidence, along with some fingernail clippers that were in the mobile home. On the agitator of the clothes-washing machine in the mobile home, which was introduced in evidence, there was a "red spot which appeared to be blood" according to the testimony of a witness. In addition, "scrapings that were characterized as blood stain" were found in the washing machine and introduced in evidence, as well as four "spent cartridges and one (1) live 44 Remington Magnum shell."
Defendant's testimony consisted of an outright denial of his presence in the house of the victim and of any connection whatever with her death. His testimony was substantially in accordance with what he had told investigating officers as narrated above as to his whereabouts on the day of the homicide. His testimony in material respects was corroborated by the testimony of his wife. She said that he had previously owned a pistol but that it had been a long time since she had seen it.
The evidence on behalf of the State and on behalf of the defendant, consisting of nearly seven hundred transcript pages, was extremely rambling. The State introduced sixty-four exhibits; defendant introduced eight exhibits. Many of the witnesses were *Page 780 
extraordinarily loquacious. It is difficult to summarize the evidence within reasonable space. We have attempted a condensation of that part of the evidence that is material to the issues raised on appeal, which we now consider and in doing so supplement our summary of the evidence by referring to some of the evidence that has been thus far omitted in order to avoid a repetition thereof. Our discussion of the issues is in the order presented in appellant's brief.
 I.
Appellant's first contention for reversal is based on some of the testimony of Boyd Dewayne Adkins, a witness for the State who at the time of the trial was serving an eight-year sentence in the Jackson County Jail for burglary. He had testified as to a highly incriminating statement that he said the defendant made to him while they were both confined in the Jackson County Jail, which incriminating statement was to the effect that he (defendant) didn't mean to kill Mrs. Neely, that he only meant to have intercourse[1] with her and that he "panicked." After giving such testimony on direct examination, he testified that Officer Freddy Hall brought him to the office of the attorney for the State who was questioning him as a witness and his testimony continued as follows:
"Q. And you came into my office, I believe?
"A. Yes I did.
 "Q. And we had a conversation in regard to this testimony, did we not?
"A. Yes, we did.
 "Q. And I believe at that time you also asked me that if you came forward and testified could I help you in some regard —
"A. Yes, I did.
"Q. — Did that not happen?
"A. Yes, sir.
 "Q. I want you to tell the jury exactly what I told you on that occasion?
 "A. You told me if I was willing to take a polygraph test based on my testimony and pass it, that you would get me early parole in Florida where I would have a job.
 "Q. Okay; and then subsequent to that, did you travel to Huntsville?
"A. Yes, I did.
"Q. And who did you go with?
"A. I went with Mr. Freddy Hall and —
"Q. The gentleman seated over here that —
"A. Yes, sir.
"Q. — Works in my office?
"A. Yes, sir.
"Q. And while there, did you make a polygraph test?
"A. Yes, I did.
"MR. DUKE: You may ask.
"CROSS-EXAMINATION
"BY MR. HARALSON:
 "Q. You are lying through your teeth, aren't you, Adkins?
"A. No, sir, I'm not.
 "Q. You made a jail-house deal — and you are convicted of burglary — you remember, I've seen you back there. You know that I've been in and out of there several times, don't you?
"A. Yes, sir, you have.
 "Q. Do you remember I asked you how long you were in for?
"A. Yes, sir.
 "Q. And you said, `A long time' — do you remember that conversation —
"A. Yes, sir.
"Q. — About a week or ten days ago —?
"A. Yes, sir.
 "Q. And suddenly on March 15, after you say this man, who if he did it would have been foolish to do what you say he did, but if he did it you say he just started spilling his guts to you a little at a time in the cell back here, is that what you want this jury to believe?
"A. That's what I said.
"Q. And you want out bad, don't you, Dewayne? *Page 781 
 "A. I took a polygraph test to prove I was telling the truth.
 "Q. Well, there's ways of beating a polygraph test and you know that as well as I do, is that not correct?
"A. I do not know.
 "Q. Okay; so, you made a jail-house deal right here at the last minute to save this case for the D.A., didn't you?
"A. No."
Soon thereafter, the witness concluded his testimony, and then the court was in recess until the following morning, and promptly after the court reconvened in the case, the following occurred:
 "MR. HARALSON: We move for a mistrial, Your Honor, on the grounds that the witness, Dewayne Adkins, made reference to having taken a polygraph test which was not responsive to any question asked by anybody that I heard and it's been ruled in Flurry v. State, [52 Ala. App. 64], 289 So.2d 632 (1973), it's a 1973 case —
"THE COURT: What's that citation again?
"MR. HARALSON: 289 So.2d 632.
"THE COURT: How do you spell that Flurry?
"MR. HARALSON: F-L-U-R-R-Y.
"THE COURT: All right.
 "MR. HARALSON: That polygraph results or examinations are not admissible in evidence.
"THE COURT: All right. Overruled. Bring the jury in."
As shown by Flurry v. State and numerous other authorities cited by appellant, before and after Flurry, results of lie detector tests are not admissible in evidence. However, our attention is not called to any authority in which it is held that the injection into evidence of the results of lie detector tests requires or justifies a mistrial. We do not condone the injection of the matter into the case by the State, but we are not convinced that error prejudicial to defendant resulted from the court's denial of defendant's motion for a mistrial.
Two other issues raised on appeal pertain to that part of the testimony of Boyd Dewayne Adkins we have just discussed, and we will refer to it again in our discussion of such other two issues.
 II.
In his caption to this issue, appellant states:
 "The trial court erred in denying the defendant's motion for a new trial. The evidence produced by the defendant upon hearing on its motion for new trial established that the witness, Boyd Adkins, was acting as an arm of the State when the alleged confession was given to him by the accused."
The following is ground 21 of defendant's motion for a new trial:
 "The court erred in allowing the witness, David Boyd Adkins [sic], to testify concerning the alleged confession given to him by the Defendant in that any such alleged confession was elicited from the Defendant in violation of his Sixth Amendment right to counsel. The witness had become an agent of the State in reporting the alleged conversations which he had with the Defendant to law enforcement officers and other agents of the State. The facts surrounding the witness' reporting to law enforcement officers of the alleged conversations could not have been discovered with reasonable diligence by the Defendant since the Defendant was not afforded the names of the witnesses to be called by the State during the trial."
Defendant attempted to support ground 21 of his motion for a new trial partly by the testimony of Adkins. The motion for a new trial was heard on May 5, 1982, about one month after this appellant had been sentenced in the instant case. In the early part of the testimony of Adkins on the motion for a new trial, he testified:
 "Q. Do you recall being indicted for the offense of murder?
"A. Yes, sir. *Page 782 
 "Q. All right; and on the 17th of February of 1982 was that charge nol prossed on motion of the State?
"A. Yes it was.
". . . .
 "Q. Mr. Adkins, how long have you been incarcerated in the Jackson County Jail?
"A. Nine months today.
"Q. Nine months?
"A. Yes, sir.
 "Q. You were incarcerated back in December and January and February and March?
"A. Yes I was.
 "Q. On any occasion has the Defendant in this case, Billy Ray Jones, talked with you?
"A. Yes, around January [1982]. Sometime in January.
"Q. The first part of January?
 "A. Yes, Billy Ray and I we spent time playing cards through the feeder hole and playing checkers.
 "Q. All right; you all were friends, would you say that?
"A. We talked, yes.
 "Q. All right; do you recall when you first started talking with him?
 "A. Right after I was put out in the hall to paint the jail as trustie [sic].
"Q. All right; when was that?
 "A. That was around — somewhere around the middle of January.
"Q. The middle of January?
"A. Yes sir.
". . . ."
According to further testimony of the witness, defendant made no incriminating statement in the hearing of the witness the first time defendant talked with him. The defendant then stated that he was being framed. However, according to the witness, on the second occasion that defendant talked with the witness about his case, the defendant made the incriminating statement, or confession as it is called by appellant, to the effect that he did not mean to kill the victim, etc. The witness stated that said incriminating statement or confession was made to him the "end of January or the first of February." His testimony as to the sequential relation among the incriminating statement, his communication of the incriminating statement to any person connected with the prosecution, and the nolle prosequi of the murder charge against him is not as definite as it should be. However, in the last of his testimony on the motion for a new trial, he testified on cross-examination by State's counsel:
"BY MR. DUKE:
 "Q. I just got one question, Dewayne. The agreement that we made, of course, it's in the record but it had absolutely nothing to do with the murder charge, is that correct?
 "A. That's correct. The agreement that we made Dwight [sic, but evidently this should be `, Dwight,' as the attorney asking the question was District Attorney Dwight Duke], was on March the 15th and the murder charge was nol prossed, February the 17th. It was before I'd even talked to you on this."
On the motion for a new trial defendant called as witnesses persons connected with the prosecution, but no witness testified in effect that Boyd Adkins had been authorized or requested by any official, officer, or agent of the State to attempt to procure incriminating information from the defendant. The closest to evidence thereof is to be found in the testimony of Investigator J.C. Ferrell, of the Jackson County Sheriff's Department, as follows:
 "Q. After receiving the information on the first occasion in January, did you report this to the D.A.?
 "A. I went and asked Dwight could we use the testimony of Dewayne [Boyd Dewayne Adkins] and told him basically what he had said.
 "Q. All right; did you give Dewayne any instructions about going back and listening to Billy Ray and report anything else that he said to you?
 "A. I told Dewayne that I wouldn't tell him to go back because I didn't know if that would contaminate the evidence but I also said that if he tells you anything, *Page 783 
especially about the gun, that I would like to know about it, but I'm not asking you to do it.
 "Q. All right; but you told him that if he tells you anything especially about the gun, that you would like to know about it?
"A. Yes, sir.
"Q. Did you talk with him on any other occasion?
"A. Dewayne?
"Q. Yes, sir.
"A. Dewayne was out — he would talk everyday to us.
 "Q. All right; let me be more specific then. Did you ever talk with him again about Billy Ray Jones?
"A. The next time was the note that he handed me.
 "Q. All right; did you have another conversation with him other than the note after that?
 "A. I asked him would he testify and he said no, I can't.
 "Q. All right; did you ever talk to him again after that?
"A. No.
"Q. Did he ever tell you anything about the gun?
"A. No."
The only authorities cited by appellant in support of the issue now under consideration are Powell v. Alabama,287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); Massiah v. United States,377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and Beattyv. United States, 377 F.2d 181 (5 Cir. 1967). No principle of law is set forth in Powell that accords with the second contention of appellant. Powell stands resolutely for the proposition that the appellants' judgments of conviction and sentence to death were reversible because of the failure of the State of Alabama to provide them with the assistance of counsel for their defense, in violation of the Sixth Amendment to the Constitution of the United States. The only similarity between that case and the instant case is to be found in the fact that the trials of the defendants in the cited case and the trial of the defendant in the instant case were in the same town and that the defendants in the cited cases were arrested and taken off the train in the same town as the occurrence of all of the circumstances in the instant case. Powell and its companion cases are inapposite. Massiah v. State, supra, is to the point urged by appellant in the second issue presented by him, in that Massiah stands for the proposition that the Sixth Amendment right to counsel of an indicted accused is violated by action of officers of the prosecuting sovereign in obtaining surreptitiously through an informer an incriminating statement from the accused without benefit of counsel. According to the undisputed evidence, no such action occurred in the instant case.
Beatty v. United States, does not support appellant's contention. In affirming the judgment of the trial court, the United States Circuit Court of Appeals, Fifth Circuit, after fully considering Massiah v. United States, concluded its opinion at 377 F.2d 191, as follows:
 "Government agents are not required to turn a deaf ear at the first sign that an accused is going to voluntarily admit his wrongdoing. If the accused voluntarily desires to talk about his illegal activities, government agents are not compelled to excuse themselves but they may listen with impunity. However, we wish to emphasize again that government officers are forbidden to contact and induce or encourage an accused to talk in order to obtain, procure or elicit information from him at a time when he is entitled to counsel, but his counsel is not present."
Our conclusion is that the testimony of Boyd Dewayne Adkins relative to the incriminating statement or confession of defendant was correctly allowed in evidence.
 III.
Appellant urges that the trial court erred in allowing twelve photographs of the body of the victim to be introduced in evidence. He does not refer to the pictures as "gruesome" but as evidence that "could do nothing but arouse and inflame the jury's senses against the one accused of *Page 784 
inflicting those wounds." Apparently both parties are in agreement that gruesomeness standing alone is not a sufficient reason for the exclusion of relevant photographs even though they may tend to inflame the jury. Hurst v. State, Ala.Cr.App.,397 So.2d 203 (1981), writ denied, Ex parte Hurst,397 So.2d 208 (Ala. 1981). The case chiefly relied upon by appellant isRollings v. State, 160 Ala. 82, 49 So. 329 (1909), in which at160 Ala. 89, 49 So. 329 it was held that the saddle of the horse the victim of an alleged homicide was riding and the suspenders he was wearing at the time he was killed, as well as the tobacco, keys and ring found on his person, were erroneously introduced in evidence as they afforded no evidence of violence and "had no tendency to show how, by whom, or in what manner deceased was killed." Furthermore, in that case, there was no issue as to the identity of the defendant as the killer of the deceased, while in the instant case it was the principal issue from the beginning of the trial and became the sole issue before the trial ended. The photographs were properly in evidence.
 IV.
The fourth issue presented by appellant is thus captioned in his brief: "THE TRIAL COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION FOR A CHANGE OF VENUE BECAUSE OF PRE-TRIAL PUBLICITY." There was considerable pretrial publicity, which is to be expected in a case such as this case. However, there is no contention that there was anything unfair about the publicity. Existence of widespread publicity does not in and of itself indicate that an accused cannot obtain a fair trial. Botsfordv. State, 54 Ala. App. 482, 309 So.2d 835 (1974), cert. denied,293 Ala. 745, 309 So.2d 844; Jenkins v. State, Ala.Cr.App.,339 So.2d 133 (1976), cert. denied, 339 So.2d 137 (Ala. 1976);McLaren v. State, Ala.Cr.App., 353 So.2d 24 (1977), cert. denied, 353 So.2d 35 (Ala. 1977); McCray v. State, Ala.Cr.App.,395 So.2d 1057 (1980), cert. denied, 395 So.2d 1062 (Ala. 1981). No evidence was presented as to whether defendant could obtain a fair trial. There is nothing to indicate that the trial court abused the sound discretion vested in it in denying defendant's motion for a change of venue. Its ruling in that respect does not constitute reversible error.
 V.
Appellant contends that the trial court erred "in failing to grant the defendant's motion for a new trial based on his not being afforded adequate counsel at trial." Appellant divides this particular contention into two separate parts, which we will now discuss under the respective headings of A and B, in treatment of appellant's separate and several reasons why the court should have granted defendant's motion for a new trial based upon ground 23 thereof as follows:
 "The Defendant, during the trial of this cause, was not afforded adequate counsel in violation of his Sixth Amendment right to counsel during trial in that trial counsel defense of the indictment in this matter rendered the trial a farce and mockery of justice, thereby requiring a new trial to be granted to the Defendant."
The two separate and several parts of defendant's fifth contention are directed at the allegations contained in ground 21 of defendant's motion for a new trial, which we quoted in II above. Both parts of appellant's fifth contention pertain to the testimony of Boyd Dewayne Adkins, which we consider again in connection with appellant's fifth contention.
 A.
Appellant asserts: "Defense counsel's failure to object to this testimony [the testimony of Boyd Dewayne Adkins to the effect that he had taken a polygraph test hereinbefore discussed] prejudiced the Defendant's case to the point that it was incurable by their motion the next day for a mistrial." We do not understand the rationale of the conclusion in appellant's brief we have just quoted. Nevertheless, we are persuaded that defendant's trial counsel *Page 785 
cannot justifiably be charged with inadequate or ineffective representation in what they did or omitted at the time Adkins was being questioned by the State as to what defendant had told him. We have set forth enough, we think, in II above to show that in the light of all the circumstances, defendant's counsel could not be properly blamed for not objecting to the line of questions by State's counsel as to what transpired between the witness and State's counsel after the witness had been brought to the office of State's counsel relative to what the witness said had been told him by the defendant. It is to be noted that the first part of his testimony as to what transpired between him and the attorney for the State and Officer Freddy Hall tended to lead one to believe that defendant would be helped thereby in connection with the then existing status of the witness as a previous law violator. In no question propounded by the State was the word "polygraph" used. The word first came in an answer of the witness to a question asked him by State's counsel. It seems reasonable to us that it was not unreasonable for defendant's counsel to have withheld any objection, motion to exclude, or motion for a mistrial at that time, until the particular inquiry had been completed. Furthermore, it is to be noted that it is far from certain and clear at that time that the witness passed the test satisfactorily. At any rate, it appears that promptly after the witness had said that a polygraph test had been taken by him, counsel for defendant proceeded with strong cross-examination of the witness that was calculated to shake the confidence of the jury in the credibility of the witness. Although the overall result turned out to be unfavorable to defendant, it cannot be said with certainty that, had it not been for other circumstances in the case, the fact that the witness was induced to testify on behalf of the State on the subject by reason of promise of help from the State as to getting him an "early parole in Florida" where he would have a job, would not have been of great benefit to defendant.
 B.
In another part of defendant's fifth contention, he argues that "Defense counsel failed to call witnesses from the Jackson County Jail to impeach the testimony of Boyd Dewayne Adkins as per his [sic, but which we construe as if it were `defendant's'] request. Said witnesses' names were forwarded by the Defendant to his attorneys (R. 736)." We quote the pertinent part of the cited page of the record wherein the defendant testified on the motion for new trial as follows:
 "After the testimony of Boyd Adkins, I asked them to subpoena several people that I had did approximately two months time with in the back bull pen, which I had been around them quite more than I had anyone else and I wanted them to come forward and state if I had ever at any time even discussed my case or even said anything at all about an act of violence toward Mrs. Neely or anything.
"Q. Did you provide your counsel with names?
"A. Yes, sir, I did."
We seriously question the admissibility of any negative testimony by persons other than Adkins to the effect that the defendant had never made any incriminating statements to them.
We conclude our consideration of Issue V presented by appellant by observing that the transcript shows that the trial court did not overlook any of the grounds of the motion for a new trial, including particularly ground 23 as to the question of adequate representation by defendant's counsel. The court made it known, in admirable fashion, after argument of counsel as to the motion for a new trial, that it gave consideration to each and every ground of the motion. As to No. 23, the court said:
 "Number 23: The Defendant, during the trial of this cause, was not afforded adequate counsel in violation of his Sixth Amendment right to counsel during the trial in that trial counsel defense of the indictment in this matter rendered the trial a farce and mockery of justice, thereby requiring a new trial to be *Page 786 
granted to the Defendant. The Court has heard the evidence in support of that ground and in addition presided over the trial and it was the judgment of the Court that the Defendant did receive good representation. The attorneys that were appointed to represent the Defendant well prepared the case and it was well presented, and that motion is overruled."
The trial court was in a better position than are we to observe the handling of the case by counsel for defendant. We find no basis in the record proper or transcript before us to cause us to disagree with the trial court on the point.
 VI.
As a final contention for a reversal, appellant says,
 "The sentence of the Defendant constitutes cruel and unusual punishment."
He cites no authority whatever for such contention. The contention is without merit and needs no discussion.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.
[1] He made clear his passionate desire by the use of a well known vulgarism.