289 So.2d 632

**Virginia FLURRY**

**v.**

**STATE.**

**5 Div. 68.**

Court of Criminal Appeals of Alabama.

Sept. 25, 1973.

Rehearing Denied Jan. 2, 1974.

———◆———

Russell, Raymon & Russell, Tuskegee, for appellant.

William J. Baxley, Atty. Gen., and Frederick T. Enslen, Jr., Sp. Asst. Atty. Gen., for the State.

ALMON, Judge.

Virginia Flurry was indicted for murder in the first degree by a Tallapoosa County Grand Jury for the East Side of the Tallapoosa River at Dadeville. She was found guilty by a Jury of manslaughter in the first degree, and her punishment was fixed at ten years in the penitentiary.

Donna Kay Flurry, the appellant's stepdaughter, died on April 20, 1970, of massive hemorrhaging of the major blood vessels of the liver due to traumatic injury. The blow which resulted in death was delivered around 3:45 P.M. while Donna Kay

was at home with the appellant, Donna Kay's sister Angelia, and her halfbrother and halfsister, Mark and Stephanie Flurry. At the trial on October 8, 1970, Mark was eight years old, Angelia was thirteen, and Stephanie was six. Donna Kay was eleven years old at the time of her death.

The State's theory was that the appellant, not feeling well on the day of the injury, delivered the fatal blow while disciplining Donna Kay. Evidence for the defense tended to show that Angelia kicked Donna Kay in the stomach, thereby causing death.

Donna Kay's body bore extensive superficial injuries, some which were received at or about the time of death (within twenty-four hours of death). The fatal blow, according to the State toxicologist, separated the connective tissue of the liver, ruptured the liver along the line of its two lobes, ruptured the major vessels supplying blood to the liver, and damaged tissue behind the liver. There were at least three distinct head wounds and various assorted abrasions, contusions and bruises. According to the toxicologist, the blow immediately caused the victim to go into shock, and death soon resulted from the unchecked internal bleeding.

Appellant's counsel argues in brief that the trial court committed reversible error in several instances and argues twenty-three propositions of law in support thereof. These matters will be treated separately.

I

The appellant made application to the trial court for a change of venue. Tit. 15, § 267, Code of Alabama 1940. This application was denied after a hearing.

The appellant contends that the trial court's ruling on the application to change venue was an abuse of discretion.

While there is no presumption in favor of the trial court's ruling on the application for change of venue, the matter of granting such a change addresses itself to the sound discretion of the trial court. Littlefield v. State, 36 Ala.App. 507, 63 So.2d 565.

On motion for change of venue, the burden is on the defendant to show to the reasonable satisfaction of the court that an impartial trial and an unbiased verdict cannot be reasonably expected. Godau v. State, 179 Ala. 27, 60 So. 908; Maund v. State, 254 Ala. 452, 48 So.2d 553.

Of the thirteen witnesses called by the defense at the hearing, nine were either relatives, bondsmen, worked with appellant's husband, or close friends of appellant or her husband. In brief, appellant places much emphasis upon the testimony of six witnesses to the effect that they believed that many persons of Tallapoosa County, if called to serve on the jury venire to try this case, would not give truthful answers to qualifying questions. It was developed on cross-examination of these witnesses that five of the six fit the category above mentioned as either friend or relative of the appellant and her husband.

The mere belief of the party applying, or his witnesses, that a fair trial cannot be had is not enough to sustain an application for a change of venue. Lee v. State, 246 Ala. 343, 20 So.2d 471. Facts and circumstances rendering a fair trial improbable must be made to appear. Haynes v. State, 40 Ala.App. 106, 109 So.2d 738.

The evidence tended to show that there was widespread feeling at the time of the incident on April 20, 1970, and at the preliminary hearing on June 10, 1970, however, the trial was held on October 8–10, 1970, and cross-examination of the various witnesses revealed that feeling had calmed considerably by trial date. It is understandable that a charge of this nature, a capital case involving child abuse, would naturally cause widespread feeling. Yet such a situation does not force the conclusion that a fair trial cannot be had.

In Maund v. State, supra, the court, in deciding that the defendant had failed to meet the burden of proof for a change of venue, observed as follows:

"The most that can be said of defendant's evidence in support of his application for a change of venue is that it revealed public indignation at the atrocity of the crime immediately after its commission; general discussion of the guilt or innocence of the defendant; statements by one or two persons that the defendant deserved the death penalty; rumors of similar statements by others not identified; rumor to the effect that defendant might be mobbed or lynched; the opinion of affiants that defendant could not get a fair trial and an unbiased verdict in Coffee County. These affidavits and statements by witnesses were, in substance, flatly contradicted by the affidavits of many other citizens of Coffee County. There is no evidence of any demonstration or the formation of a mob to take the law in its own hand, and there could not have existed any racial prejudice against defendant."

According to the evidence, the appellant was at large on bond pending trial. During this entire time, there was only one actual display of animosity toward the appellant, and this occurred at Donna Kay's funeral and involved a relative of the deceased.

There was no evidence whatsoever of any prejudicial news media coverage.

Although appellant's able counsel were very diligent and presented their case admirably, we are of the opinion that an abuse of discretion was not shown.

## II

The appellant argues that the trial court committed reversible error in not allowing the jury venire to be examined on voir dire in groups of twelve. The court required defense counsel to address qualifying questions to the entire panel. Appellant further argues that the denial of this request caused the jury panel to sit quietly, giving neither affirmative nor negative answers to the following questions:

"Q I'll repeat the question. Did the discussions that any of you might have had cause you to form an opinion as to the defendant, Virginia Flurry's, guilt or innocence?

"(No answer.)

"Q Have you heard anything about this case that would prevent you from reaching a verdict based solely upon the evidence given by the witnesses?

"MR. GULLAGE: I'd like the record to reflect that on the previous question there were no hands raised.

"Q Would you return a verdict as to this defendant of not guilty if you thought there was a probability of the defendant, Virginia Flurry, being not guilty? Would you return a verdict of not guilty if you thought there was a probability of the defendant being guilty?

· · · · · ·

"Q Can each one of you enter the trial of this case with the assumption that Virginia Flurry is innocent? Is there any one of you who cannot enter upon the trial of this case with the assumption that Virginia Flurry is innocent?

"(No answer.)

"Q Are you related to any of the witnesses in this case? You heard their names called earlier today.

"(No answer.)

"MR. DILLON: May it please the Court. I want the record to reflect that I asked the following questions of the jury: 'Have you heard anything about this case that would prevent you—' Excuse me, that's not the question. 'Would you return a verdict of "not guilty" if you thought that there was a probability of the defendant,

Virginia Flurry, being not guilty?' And let the record further reflect that the Court, that is the question sustained the objection.

"MR. HOLLINGSWORTH: I beg your pardon. There was no objection to that question.

"MR. DILLON: No objection? All right, sir. Then I want the record to reflect that there was not one single positive answer to that question by the jury panel. And we, therefore, would move to strike the entire jury panel for cause."

█ Requiring defense counsel to qualify a capital venire as a group does not constitute reversible error. Bowen v. State, 8 Ala.App. 103, 62 So. 1022, quoted and followed in Ward v. State, 44 Ala. App. 229, 206 So.2d 897.

Appellant relies on Sanders v. Scarvey, 284 Ala. 215, 224 So.2d 247; and Wallis v. State, 38 Ala.App. 359, 84 So.2d 788, for the proposition that the failure of the venire to respond to questions requires a reversal. Both cases may be distinguished on the fact that the defendant demonstrated injury and substantial prejudice at the hearing on his motion for a new trial. It was not the failure to answer per se that was condemned; rather, the failure to answer when there was a duty to speak. In *Sanders,* defense counsel asked whether the jurors or any member of their families had brought suit for personal injury or property damage arising out of an accident. On motion for new trial, the defense showed that three jurors who had not responded to the voir dire question had been involved in damage or personal injury suits, one as a plaintiff, one as representative for his minor son and on his own behalf for loss of services, and a third had a daughter who had recovered $500.00 and still suffered from injuries. Bloodworth, J., wrote:

"We agree with defendant's contention that parties have a right to have ques-

tions answered *truthfully* to enable them to exercise their discretion wisely in the use of their peremptory strikes. Section 52, Title 30, Code of Alabama, 1940, as last amended. When jurors fail to answer questions *correctly,* a party is denied the exercise of that right. . . ." (Emphasis added.)

In *Wallis,* supra, veniremen sat silent as defense counsel inquired into personal or family connections with peace officers, and into the holding of a deputy sheriff's commission. On motion for new trial, defendant showed that one juror held a deputy sheriff's commission at the time of trial, another had held one prior to serving as a juror, one held a courtesy card from the sheriff's office, another juror had a brother who held a courtesy card from the sheriff's office, one had a brother who was a deputy sheriff at time of trial, and yet another was the son of a deceased deputy sheriff.

█ Appellant has not shown and does not now allege such injury and prejudice as were demonstrated in these two cases. When questions are so phrased as to call for an answer only when applicable to the individual juror, the appellant cannot complain of lack of responses. There is no requirement that each juror answer each question either yes or no; under these circumstances, it is permissible for a juror to sit silent until a question applies to him in a manner demanding a response.

### III

Bill Hogan testified on direct examination by the State that he saw the appellant at the hospital when she brought Donna Kay to the emergency room. In fact, Hogan assisted in carrying Donna Kay from the car to the emergency room. During Hogan's testimony at trial, the following occurred:

"Q. Now, did you hear anything said there at the time and place between the doctor and Mrs. Flurry or yourself while

the child was being unloaded from the car or immediately thereafter?

"MR. DILLON: We object to that, your Honor.

"THE COURT: On what grounds?

"MR. DILLON: Well, it's not part of the res gestae.—

"THE COURT: Well,—

"MR. DILLON: —and besides that, it's just a number of perfect grounds.

"THE COURT: Overruled.

"MR. DILLON: We reserve an exception.

. . . . . .

"Q. The Judge said you may answer the question.

"A. I did. The doctor asked her what was wrong and she said, 'We found our child dead on the bed.' The doctor was wanting to know what the problem was.

"Q. And at that time the only person present was the three children that you've described, plus Mrs. Flurry and the child that was carried from the car? Those were the only passengers in the car that came up to the hospital, is that correct?

"A. They were the only ones in the car.

. . . . . .

"Q. In your presence, at that time and place, and in the presence of Mrs. Flurry, did you hear the doctor ask her any more questions?

"A. Yes, he asked her a statement along this line, he said, 'You mean this little child was—'. He asked her if she had been in school that day.

"Q. And what did she say, if anything?

"A. She said yes.

"Q. Did you hear the doctor say anything else in that particular conversation?

"A. The doctor said, 'Well, I don't understand a child—'.

"MR. DILLON: Your Honor, we object to what the doctor may have said.

"MR. HOLLINGSWORTH: May it please the—

"THE COURT: This was in her presence, wasn't it?

"MR. HOLLINGSWORTH: This was in the presence of Mrs. Flurry and in fact the conversation is said to be between the doctor and Mrs. Flurry.

"THE COURT: Overruled.

"A. He said, 'I don't understand how the child was healthy and in school today and in this shape now.' He said, 'What happened, what's the reason?'"

■ Appellant contends the trial court committed reversible error in overruling the objection to the following question: "Did you hear the doctor say anything else in that particular conversation?" As indicated by the aforementioned excerpts, the predicates were properly laid for evidence of appellant's tacit admission of the doctor's assertion. Raymond v. State, 154 Ala. 1, 45 So. 895, stands for the proposition that a trial court will not be put in error for overruling a general objection to a question eliciting a declaration the veracity of which may be shown by a tacit admission. At the point in time of the ruling, the trial court had no means of knowing that the doctor's declaration would not be shown to have been tacitly admitted. We adhere to the mandates of *Raymond*, supra, wherein there was placed upon defense counsel an affirmative duty to elicit a ruling *after* specifying the failure of proof in regard to accused's silence. The proper procedure would have been a motion to exclude based on the State's failure to prove silence or

other conduct tantamount to a tacit admission. A general motion to exclude does not preserve error in this regard. *Raymond,* supra.

## IV

Appellant objected to Dr. Swindal's testifying that in his judgment the injuries he observed on Donna Kay were consistent with those on a child who had been beaten. More specifically, his objection is that there is no testimony to show that the doctor had ever observed injuries on a person who had been beaten. The record on this point is as follows:

"Q. Mr. Dillon asked you about your first impression of the child. I believe you testified, did you not, that your first impression of the child was that the child had perhaps been run over by a car?

"MR. DILLON: Your Honor, we object to leading and suggesting questions. This is Mr. Gullage's own witness. This is his own witness, it's not cross-examination.

"THE COURT: This is rebuttal to your cross-examination.

"MR. DILLON: I know it, your Honor, but it's his witness and he's not entitled to lead the witness.

"THE COURT: Mr. Dillon, you make your objection but don't you tell—

"MR. DILLON: Yes, sir, I object to the question on the—

"THE COURT: —but don't you tell me what the law is.

"MR. DILLON: Yes, sir.

"THE COURT: You make your objection—

"MR. DILLON: Yes, sir.

"THE COURT: —you see, and don't try to tell me what the law is.

"MR DILLON: Yes, sir.

"THE COURT: All right. Overruled. Now, take your exception.

"MR. DILLON: Yes, sir.

"THE COURT: You have your exception. Now, go ahead.

"Q. Doctor Swindal, would you state again for the jury what your first impression was when you saw the child as to her injuries.

"A. I just thought, you know, that there had been an accident, car run over the child or something like that.

"Q. State whether or not her injuries were consistent with a child, as you observed them, who had been beaten.

"MR. RAYMON: We object.

"MR. DILLON: We object to that, your Honor.

"A. I don't know whether she had been beaten. She had some bruises on her.

"THE COURT: Overruled.

"MR. RAYMON: We have an exception.

"Q. My question was whether her injuries were consistent with a child who had been beaten.

"MR. DILLON: We renew our objection.

"THE COURT: Overruled. This is a medical expert.

"MR. RAYMON: We reserve an exception.

"A. Yes."

■ As the record indicates Dr. Swindal earlier testified on cross-examination by defense counsel that his first impression was that the child had been run over by a car. It was permissible for the State to attempt to rebut that testimony by eliciting the doctor's opinion as to whether the injuries were consistent with those of a child who had been beaten. It should be further

noted that the objection to this question was only a general one, predicated upon no specific grounds.

■ On direct examination Dr. Swindal had been qualified generally as a practicing physician for eight years, having graduated from the Medical School of the University of Alabama and being licensed to practice medicine in the State of Alabama. Clearly, he had more knowledge than a layman with respect to injuries in general and in view of the general objection there was no error in allowing this question. Moreover, defense counsel had the opportunity to cross-examine the doctor as to whether he had ever observed similar injuries to a person, as showing his lack of experience, if indeed that was the case.

V

■ Reversible error is alleged in several aspects of the testimony of Assistant State Toxicologist Carlos Rabren. It is first urged that defendant was prejudiced by the refusal to allow defense counsel to examine Rabren on voir dire as to his qualifications as an expert. It appears from the record that his general qualifications were certainly adequate: an employee of the Toxicology Department for eight years; a B.S. degree in biochemistry from Auburn; substantial postgraduate work toward a master's degree in pharmacology and toxicology; had studied forensic toxicology and pharmacology, analytical toxicology, anatomy, physiology and zoology; and had performed about six hundred autopsies over the last three years.

To better understand the objection, we quote a portion of the record:

"Q. What were the marks you observed to her face, that is to the way of injuries.

"A. I notice two light red marks over the left cheekbone; I noted a red-blue discoloration approximately one inch in diameter right of the right eye.

"Q. Did you form an opinion as to about when the abrasions to the chin could have occurred?

"MR. DILLON: Your Honor, we're going to object to this. It's not shown this man, by any stretch of the imagination, is competent to testify as to that. I'd like certainly to ask some questions on *voir dire.*

"THE COURT: You may ask a question on *voir dire.*

"MR. DILLON: I have several, your Honor.

"THE COURT: Well, you're going to have a right to cross-examine him. Just ask him the question on this part here. Then you're going to have a right to cross-examine him, Mr. Dillon.

"MR. DILLON: No, sir, this is questions as to—I think I have a right, before he gives any opinion as to—

"THE COURT: All right. The Court will qualify him.

"MR. DILLON: Well,—

"THE COURT: Let me ask you this question. During the course of your studies and your experience have you had occasion, in looking at bruises and abrasions and cuts and contusions, and so forth, to ascertain approximately the time that they were made.

"A. Yes, sir, I have.

"THE COURT: Is that part of the State Toxicologist's job?

"A. Yes, sir, it is.

"THE COURT: Has that been taught to you?

"A. Yes, sir, it has.

"THE COURT: And is that in the usual course of a toxicologist's examination, to make a determination as to how long a bruise, or contusion, or cut, or

any other injury to the body took place?

"A. Yes, sir, it is.

"THE COURT: Respectfully overruled.

"MR. DILLON: And I understand the Court is not allowing me to ask the questions on voir dire, going into his qualifications, and from that ruling, we respectfully except.

"THE COURT: Very well. You'll have a right to cross-examine him."

It can be seen from the above quoted portion of the record that during the direct examination of Mr. Rabren defense counsel objected to the question of whether Mr. Rabren had an opinion as to when the abrasions in question could have occurred and asked permission of the court to examine the witness on *voir dire*. The trial judge then qualified the witness on the witness's experience in determining when abrasions and cuts and contusions had occurred. The questions propounded by the court showed that Rabren was qualified to make these determinations. We think this issue was settled in McLemore v. Alabama Power Co., 285 Ala. 20, 228 So.2d 780, and in State v. Wilbanks, 289 Ala. 166, 266 So.2d 619. In *Wilbanks,* supra, the Court stated:

> "Generally, 'voir dire' denotes the preliminary examination which a court makes of one presented as a juror or witness.—Springdale Park v. Andriotis, 30 N.J.Super. 257, 104 A.2d 327; Hagans v. State, 77 Ga.App. 513, 48 S.E.2d 700; State v. Lloyd, 138 Wash. 8, 244 P. 130; State v. Fox, 197 N.C. 478, 149 S.E. 735.

> "However, it has been the practice in this state for counsel to interrupt the direct examination of a witness and ask to be permitted to examine him on 'voir dire' and that seems to have been what counsel for Wilbanks did in the trial in the circuit court. And as we have indicated above, the refusal of the trial court to grant such request has been held by the Court of Appeals to constitute reversible error. This holding, in our opinion, runs directly counter to the holdings of the Court of Appeals in Stewart v. State, 38 Ala.App. 497, 88 So.2d 580, and in Kent v. State, 34 Ala. App. 443, 41 So.2d 194. The holding of the Court of Appeals in Young v. State, 41 Ala.App. 284, 130 So.2d 249, is not in conflict with the holdings of that court in *Stewart* and *Kent, supra*.

> "We have found no decision of this court or the Court of Appeals wherein it has been held reversible error for the trial court to refuse to permit the interruption of the examination of a witness on direct to permit counsel for the defendant to examine the witness on 'voir dire.' "

 Rabren had testified at the preliminary hearing that there were no wounds on the anterior torso of the deceased. According to Rabren, between the time he testified at the preliminary hearing and the time of the trial, he had consulted the pictures and slides taken during the autopsy and realized that there was in fact a bruise on the front side of the body. This inconsistency was brought out and the following occurred on re-cross:

"BY MR. DILLON:

"Q. Mr. Rabren, did you hold up your hand before God and swear to—

"MR. HOLLINGSWORTH: Now, we —

"THE COURT: The Court is not going to allow that sort of stuff, no, sir. That's—

"Q. Were you sworn?

"THE COURT: That's an insult.

"A. Yes.

"Q. Were you sworn?

"THE COURT: That's—

"Q. At the preliminary?

"A. Yes, sir.

"THE COURT: Don't insult this witness. He was subpoenaed to this Court and he had to come under the subpoena of this Court. Now, we're not going to have any insulting of this witness—

"MR. DILLON: Yes, sir. We respectfully except to the Court's remarks."

The appellant argues that the court's statements to defense counsel were prejudicial and cites Neal v. State, 36 Ala.App. 156, 54 So.2d 613; and Powell v. State, 20 Ala.App. 606, 104 So. 551. The above cases demonstrate much stronger and obviously prejudicial remarks, but the offending language here does not approach the language used in those cases. Defense counsel earned a reprimand by persisting in a forbidden line of questioning. Tit. 7, § 442, Code of Alabama 1940, recompiled 1958, provides: "It is the right of a witness to be protected from improper questions and from harsh or insulting demeanor."

Certainly the trial judge should have refrained from the use of the word "insult," but under the circumstances we do not think it was prejudicial error.

In an effort to clarify this obvious inconsistency in Rabren's testimony, the following occurred:

"A. The autopsy was before the preliminary hearing.

"THE COURT: Before the preliminary hearing?

"A. The color slides were developed after the written report was made, your Honor. And I didn't get to study those until—

"THE COURT: Can you explain any inconsistencies in your testimony today and at the preliminary hearing?

"A. Yes, sir, I believe I can.

"THE COURT: All right. Tell me what they were.

"MR. DILLON: We respectfully object.

"THE COURT: Respectfully overruled.

"MR. DILLON: We have the exception.

"A. The inconsistencies which Mr. Dillon has noted and which are correct was the failure of the preliminary hearing to mention and even to state that none was present of any other type of wounds on the anterior torso other than the old bruise noted on the chest. After going back and studying my color slides of the body and studying the color photographs again in detail, I noted the presence of a red mark, a contusion which I described to the jury today, beneath the old bruise noted on the chest. At that time I realized I was in error in the preliminary hearing, and that indeed there was evidence of a recent bruise on the anterior torso. I have the colored slides if you want to see them."

Appellant argues that the above question by the trial judge directed to Rabren asking him if he could explain his inconsistent testimony amounted to a comment on the evidence by the trial judge. We do not consider this to be such. Rabren readily admitted that his testimony at the preliminary hearing was inconsistent with his testimony at trial. This fact was stressed by defense counsel on recross-examination, but no explanation for the existence of the inconsistency was put before the jury by either side. It was obvious to everyone that the inconsistency existed. A judge has the prerogative, and in some cases the duty, to ask questions of witnesses to illuminate the issues for the jury.

VI

Several neighbors of appellant were permitted over objection to testify that appellant had used obscene, profane and abusive language in scolding her stepchildren. Typical of the unsavory utterances were:

"You're too sorry to live;" "You little son of a bitch;" "You Goddam son of a bitch;" "You little bastard;" and statements to the effect that decedent's mother was an insignificant human being and that decedent should have died with her mother. Appellant objected to these statements asserting that they were without the res gestae and did not indicate threats. The statements spanned a period of approximately three years next preceding Donna Kay's death.

■ We are of the opinion that the aforementioned statements were properly admitted as evidence of hostility directed toward deceased. Evans v. State, 62 Ala. 6; Woodard v. State, 253 Ala. 259, 44 So. 2d 241; Parvin v. State, 248 Ala. 74, 26 So.2d 573. It is immaterial in this regard that the natural import of the statements is not threatening in character. *Evans,* supra; *Woodard,* supra; *Parvin,* supra. Remoteness in time of hostile statements, like remoteness in time of threats, is a matter affecting the weight or probative value of the statements and does not render the statements inadmissible. Pate v. State, 94 Ala. 14, 10 So. 665; Blue v. State, 246 Ala. 73, 19 So.2d 11.

### VII

■ Appellant argues reversible error in the refusal of the trial court to allow a showing of the results of a polygraph test taken by the defendant. The defense proffered a polygraph operator and a Birmingham doctor who had examined Angelia Flurry under truth serum. Their evidence was not allowed to go to the jury. The defense was allowed to show the scientific principles involved in the polygraph, the procedures involved in an examination, and the scientific reliability of the machine. The showing was cut short when the defense sought to show the results of the examination of the defendant. The results of a polygraph examination are not admissible into evidence. Wilcutt v. State, 41 Ala.App. 25, 123 So.2d 193; Graham v. State, 46 Ala.App. 608, 246 So.2d 675; Johnson v. State, 46 Ala.App. 725, 248 So. 2d 763.

"The courts almost uniformly reject the results of lie detector tests when offered in evidence for the purpose of establishing the guilt or innocence of one accused of a crime, whether the accused or the prosecution seeks its introduction, for the reason that the lie detector has not as yet attained scientific acceptance as a reliable and accurate means of ascertaining truth or deception. Truth serum tests occupy much the same position as lie detector tests, and no court has as yet recognized the admissibility of the results of such tests, at least for the purpose of proving the truth of the matter asserted, although their admissibility for other purposes, such as on the question of insanity or sex deviation, has been recognized. . . ." 29 Am.Jur.2d, Evidence, § 831.

See also 41 A.L.R.3d 1369; 23 A.L.R.2d 1306.

■ Since polygraph tests are inadmissible, there was no error in shutting off the examination of the operator. The rule that an offer of proof should be allowed by the trial court exists in order to afford an appellate court an opportunity to adequately review the trial court's ruling. Unless an appellate court knows what the witness would have answered, it cannot intelligently decide whether the trial court's ruling constituted error. In the present case the record adequately reflects that the witness would testify that Mrs. Flurry took a polygraph test and made certain answers to questions. Since the whole subject is patently inadmissible and the record affords enough information for adequate appellate review, there was no error.

### VIII

Finally, error is claimed in the overruling of the motion to exclude the State's evidence, in refusing to give the affirma-

tive charge, and in the overruling of the motion for new trial. Appellant argues that the evidence was insufficient to sustain the verdict.

From a reading of the record it is clear that this was a hard fought circumstantial evidence case. Due to the nature of the offense it is quite natural that emotions were stirred. Both counsel for the State and for the defense were convinced of the justness of their cause.

■ The jury was presented with a case where a young child was fatally injured on an occasion when only the appellant, her two stepdaughters Donna Kay and Angelia, and two other small children were present. The two small children, Mark and Stephanie, clearly were not involved. Angelia testified that she inflicted the fatal blow and the appellant's testimony substantiated Angelia's testimony. Yet other testimony indicated that appellant was abusive toward her stepchildren in disciplining them. More importantly, it was a jury question as to whether Angelia was physically powerful enough to inflict upon Donna Kay the fatal injuries. Angelia demonstrated to the jury, showing the force with which she allegedly kicked the deceased. The jury could very well have, and must have, concluded that the appellant was the only person present who was strong enough to have inflicted this severe fatal blow.

■ We conclude that the evidence presented raised questions of fact for the jury and such evidence, if believed, is sufficient to sustain the verdict. We will not disturb the jury's resolution of this most difficult case.

The judgment appealed from is therefore due to be and is hereby

Affirmed.

CATES, P. J., and TYSON and De-CARLO, JJ., concur.

HARRIS, J., concurs in the result.