ALMON, Justice.
Marvin Mayo was convicted in the Madison Municipal Court of driving under the influence of alcohol. Upon his appeal to the circuit court for a trial de novo, he filed a motion to suppress the results of a breath test that was administered to him. The circuit court held two hearings on the motion, with testimony presented by the officer who administered the test, the officer who inspected the machine on which Mayo was tested, an expert on behalf of Mayo, the director of the Department of Forensic Sciences (DFS), and the deputy director of DFS, who is the technical director of the blood alcohol testing program. After hearing this evidence, the circuit court denied the motion. Mayo then pleaded guilty, reserving the right to raise on appeal the denial of his motion to suppress. The Court of Criminal Appeals affirmed with an unpublished memorandum. 635 So.2d 920 (table).
Mayo states three issues that he alleges to be of first impression. The first concerns the adequacy of DFS’s breath testing rules. He asserts that the Court of Criminal Appeals erred in holding that the administrative rules promulgated by the Alabama State Board of Health and now applied by DFS are sufficient written guidelines for the administration of the breath testing program in the State of Alabama. He continues:
“For the first time the Appellate Courts of Alabama are being asked to look at the breath testing program and its ‘rules’ to judicially determine if the program is set up in a way to reasonably ensure that a given breath test result is an accurate and reliable reflection of the amount of alcohol in that tested individual’s system.”
There are two components of this issue: One, whether the methods, for inspecting the machines should be set forth in published rules, and two, whether the methods adopted for testing individuals give a sufficient guarantee of accuracy and reliability to support admission of the test results.
*203 The- second issue is whether DFS has improperly continued to apply the rules promulgated by the Board of Health or has improperly amended them without complying with the Administrative Procedure Act. The third issue is whether, assuming that the breath test is not admissible pursuant to a statute, a sufficient predicate was laid for the admission of the breath test.
Code 1975, § 32-5A-194(a), provides for the admission of evidence of chemical tests:
“Upon the trial of any ... criminal ... action ... arising out of acts alleged to have been committed by any person while driving ... a vehicle while under the influence of alcohol ..., evidence of the amount of alcohol ... in a person’s blood at the alleged time, as determined by a chemical analysis of the person’s blood, urine, breath or other bodily substance, shall be admissible. Where such a chemical test is made the following provisions shall apply:
“(1) Chemical analyses of the person’s ... breath ... to be considered valid under the provisions of this section shall have been performed according to methods approved by the department of forensic sciences and by an individual possessing a valid permit issued by the department of forensic sciences for this purpose. The court trying the case may take judicial notice of the methods approved by the department of forensic sciences. The department of forensic sciences is authorized to approve satisfactory techniques or methods, to ascertain the qualifications and competence of individuals to conduct such analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the department of forensic sciences. The department of forensic sciences shall not approve the permit required in this section for making tests for any law enforcement officer other than a member of the state highway patrol, a sheriff or his deputies, a city policeman or laboratory personnel employed by the department of forensic sciences.”
(Emphasis added.) Act No. 88-660, Ala. Acts 1988, transferred these responsibilities to DFS from the Board of Health simply by amending this section to read “the department of forensic sciences” everywhere it had formerly read “the state board of health.”[1] Section 2 of that Act, now codified at § 32-5A-194.1, also preserved the rules promulgated by the state Board of Health “until rescinded, modified or adopted” by DFS.
The only existing rules for breath testing were promulgated by the Board of Health in 1982 and were amended in 1982, 1984, and 1987. They have not been amended by DFS; indeed, they are still in the Alabama Administrative Code in the chapter for rules of the State Board of Health/the Department of Public Health. The breath testing rules are a single page long. Rule 1 states that an applicant for a testing permit “must have satisfactorily completed the course in the theory and operational procedures of the breath testing instrument and be a full-time employee for one of the agencies listed in Section 32-5A-194.” Rule 2 regards permits: 2(a) provides that the permits will be “issued by the State Health Officer and certified by the Technical Director,” 2(b) provides for expiration of permits, and 2(c) requires continuing education each year. Rule 3 is entitled “Methods Approved by the State Board of Health,” and it reads:
“(a) There shall be a periodic inspection of each breath testing instrument. The inspection shall be conducted at reasonable time intervals set by the State Health Officer through the Technical Director.
“(b) Approval of Instrumentation.
“1. Intoxilyzer 5000. The approved procedure, technique or method of operation appears on the Intoxilyzer 5000 Operational Procedure Card.”
(Emphasis added.) Rule 4 reads simply “Appendix.”
*204 Appended to the rules is a page with the heading “Intoxilyzer 5000 Operational Procedure,” a form with blanks to be filled and steps to be marked as completed. It gives the following seven steps: “Attach Mouthpiece, Press Start Button, Insert Test Record, Subject Blows Sample, Time Sample Collected_, Remove Test Record, [and] Results_” It includes a space marked “test record,” where the printout from the machine can be attached. The form on which Mayo’s breath test was recorded is substantially like this appendix, with two changes: It adds the statement “WARNING: Subject must be under observation by the arresting officer and/or operator for a period of twenty minutes before the test is administered,” and it adds an eighth step, “Remove mouthpiece.”
In Patton v. City of Decatur, 337 So.2d 321 (Ala.1976), this Court reversed a judgment of the Court of Criminal Appeals affirming a conviction of driving while intoxicated. This Court applied the predecessor of § 32-5A-194,[2] emphasizing the language stating that a chemical analysis “shall have been performed according to methods approved by the state board of health,” 337 So.2d at 322. The Court held that proof of these methods is part of the predicate for admission of the test results. The Court concluded:
“Nowhere is it shown that duly adopted methods or regulations of the State Board of Health were followed in administering the test. The trial court therefore had before it no certified methods promulgated by the Board of Health for the administration of the test and consequently was unable to ascertain standards against which the evidence could be measured.
[[Image here]]
“Our decision in the instant case does not stand for a proposition that every legislative delegation of power gives rise to a mandatory duty to promulgate administrative standards in order for that power to be validly exercised. But our inability here to ascertain the validity of the results obtained from a technologically sophisticated device due to questionable operator technique, demonstrates the absolute necessity for written procedural methods governing its use. In this regard, unwritten standards of the Board of Health are no better than no standards at all. The need for written standards becomes particularly acute where, as here, a finding of criminal conduct may well turn upon adherence to and rigid compliance with such standards.”
337 So.2d at 324. The Court also stated that, although such tests had been challenged, the Court had been willing to admit their results where nothing substantially cast doubt on their accuracy. Furthermore, the Court stated, the legislature had declared the results of the tests admissible.
“Accordingly, in passing on a conviction which was based in part on the results of-a P.E.I. test, the only concern of this court is to ascertain whether the will of the legislature has been obeyed.[n. 1] We hold that an affirmative response to that inquiry cannot follow where there are no written standards governing the manner in which P.E.I. tests are to be performed by state law enforcement agencies.”
337 So.2d at 324-25. The footnote to the first sentence reads:
“When the legislature declares that certain evidence is admissible, the courts are bound by that declaration. This rule prevails until the admission of that evidence runs afoul of the state or federal constitutions. Evidence can be so unreliable and inconclusive as to violate due process of law. Flurry v. State, 52 Ala.App. 64, 289 So.2d 632 (1973); United States v. Fay, 284 F.2d 426 (2d Cir.1960); Blackburn v. State of Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960).”
337 So.2d at 325, n. 1.
In Elmore v. State, 348 So.2d 265 (Ala.Crim.App.1976), the Court of Criminal Appeals quoted Patton at length and reversed Elmore’s conviction, noting that no copy of *205 methods or regulations adopted by the State Board of Health was introduced in evidence. This Court, 348 So.2d 269, 271 (Ala.1977), affirmed the judgment of the Court of Criminal Appeals on this issue. Justice Maddox dissented, noting that the Board of Health had promulgated rules on March 18, 1970, five months after the Alabama Chemical Test for Intoxication Act had become law, and expressing the opinion that the Court should take judicial knowledge of those rules. See Ex parte Vizzina, 533 So.2d 658 (Ala.1988), in which this view prevailed, in part because the rules are now in the Alabama Administrative Code.
In numerous cases, this Court and the Court of Criminal Appeals have addressed the requirements for admission of evidence of chemical tests for intoxication. For cases holding that no proper predicate was laid, see, e.g., Commander v. State, 374 So.2d 910 (Ala.Cr.App.1978), cert. quashed, 374 So.2d 921 (Ala.1979); Webb v. State, 378 So.2d 756 (Ala.Cr.App.1979), cert. denied, 378 So.2d 758 (Ala.1979); McGough v. Slaughter, 395 So.2d 972 (Ala.1981); Whetstone v. State, 407 So.2d 854 (Ala.Crim.App.1981); Moore v. State, 442 So.2d 164 (Ala.Cr.App.1983); Kent v. Singleton, 457 So.2d 356 (Ala.1984); Ex parte Reed, 492 So.2d 293 (Ala.1986); and Ex parte Curtis, 502 So.2d 833 (Ala.1986). For cases holding that a proper predicate had been laid, see, e.g., Patterson v. State, 344 So.2d 543 (Ala.Cr.App.1977), cert. denied, 344 So.2d 547 (Ala.1977); Estes v. State, 358 So.2d 1050 (Ala.Cr.App.1977), cert. denied, 358 So.2d 1057 (Ala.1978); Bagony v. City of Birmingham, 365 So.2d 336 (Ala.Cr.App.1978); Parker v. State, 397 So.2d 199 (Ala.Cr.App.), cert. denied, 397 So.2d 203 (Ala.1981); Childress v. City of Huntsville, 459 So.2d 1008 (Ala.Cr. App.1984); Harper v. City of Troy, 467 So.2d 269 (Ala.Cr.App.1985); Ex parte Bush, 474 So.2d 168 (Ala.1985); Nagem v. City ofPhe-nix City, 488 So.2d 1379 (Ala.Cr.App.1986); Brown v. City of Montgomery, 504 So.2d 748 (Ala.Cr.App.1987); Pate v. State, 512 So.2d 138 (Ala.Cr.App.1987); Jemison v. State, 513 So.2d 47 (Ala.Cr.App.1987); Baker v. City of Htmtsville, 516 So.2d 927 (Ala.Cr.App.1987); Sanders v. City of Birmingham, 542 So.2d 325 (Ala.Cr.App.1988); and Seewar v. Town of Summerdale, 601 So.2d 198 (Ala.Cr.App.1992).
In none of the above-cited cases, however, was the argument made that the rules shown to have been adopted were insufficient to ensure accuracy and reliability. Most of the cases pertain either to blood tests or to breath tests administered on the photoelectric intoximeter (P.E.I.) machine. Of the above-cited cases, only Baker and Sanders concerned Intoxilyzer 5000 (“1-5000”) machines. Pate involved the question whether the evidence showed that the officer who administered the P.E.I. test had performed step 18 of the procedures for that machine. The P.E.I. was more complex to operate than the 1-5000 is, and much of the litigation regarding it arose from the fact that it could be calibrated at the time of a breath test by the officer administering the test. Thus, in Bush, this Court held that it was not necessary to show that the person who performed monthly inspections was certified by the Board of Health, because any calibration performed by the inspector was superfluous, “since the accuracy of the test results is dependent upon the final calibration by the administrator of the test, and not the previous calibrator.” 474 So.2d at 170. Similarly, Reed held that there was no need to show periodic testing of a P.E.I. machine because of the final calibration made by the officer administering the test. 492 So .2d at 294-95.
By contrast, an 1-5000 machine cannot be calibrated by an inspector or an operator, and if it gives inaccurate readings it must be returned to a manufacturer-authorized repair facility. Thus, while the procedures for operating it are much simpler than the procedures for the P.E.I., the necessity for ascertaining that it has given an accurate result in a particular test cannot be met by a showing that the officer administering the test has followed the operating rales promulgated by the Board of Health.
Mayo challenges Rule 3, regarding inspections of the 1-5000, on the grounds that it does not state who is to do inspections, what is supposed to be done in inspecting, what constitutes passing inspection, and what happens if a machine fails inspection. The following is a summary of the evidence regard *206 ing the inspection and operation of the I-5000.
Inspection of each 1-5000 machine in the state is performed once a month by state troopers employed within the Implied Consent Unit of the Department of Public Safety; these inspectors also teach at the school in Selma where 1-5000 operators are trained according to Rule 1 of the rules promulgated by the Board of Health and now applied by DFS. The machine on which Mayo’s breath was tested was inspected on October 3, 1990, and November 5, 1990; Mayo’s test was on October 14. The deputy director of DFS in charge of blood alcohol testing, James M. Buttram, testified that there are written protocols for inspecting the I~5000’s, but no such protocols were introduced.[3] The log on which the breath tests and the inspections are recorded states simply “Checks OK” on the lines where the trooper indicates his or her inspection of the machine; it gives no indication of how the inspection is performed.
The trooper who inspected the 1-5000 on which Mayo was tested, Sgt. Arthur Means, testified that he performs an inspection in the following manner. He brings with him a sample of known alcohol content.that can be attached to the 1-5000. The 1-5000 is designed to draw air through the sample to simulate a breath test, and the alcohol in the sample is calculated to simulate a test result of .100% blood alcohol content. Sgt. Means testified that the machine passes the inspection if the simulation gives results within plus or minus 10 percent, i.e., no less than .090% and no more than .110%. He testified that he makes five simulations, and that if the tests are not grouped within a close range, he will reject the results even if they all fall within 10 percent of .100%. Sgt. Means testified that he writes the readings from the simulator tests on a duplicate form of which he keeps one copy and sends the other copy to the Montgomery office of the Department of Public Safety, and that he writes “Checks OK” on the log that is kept with the machine. He testified that he uses the same sample until it starts giving erratic results, at which time he replaces it. After making the simulation tests, Sgt. Means then performs a breath test on himself.
Sgt. Means testified that this method of inspecting is a policy of the Implied Consent Unit, but that it is not in writing. He testified that he turns off the printer of the I-5000 and writes the results of the simulation by hand. The director of DFS, C.L. Rabren, and the deputy director, Buttram, testified that they did not know that the inspectors turned off the I-5000’s printer before testing the machine. There was also evidence that DFS in 1992 changed the tolerance of the inspection to plus or minus five percent, but no 'written record of this change was introduced.
Mayo introduced testimony by an expert witness, Richard Jensen, with extensive experience in chemical testing for blood alcohol content. Jensen testified that accuracy and reliability are absolute requirements “if we’re going to use, in evidential breath testing, a number on which we decide whether something is legal or illegal.” He said that a “primary concern” is that there must be “sufficient guidelines such that all instruments and all individuals are treated the same in the operation and evaluation of accuracy and reliability.” Jensen agreed that the 1-5000 is the best breath testing machine available; he administers a breath testing program at nuclear power plants in Minnesota, and those plants use the 1-5000. However, he criticized the method of testing used in Alabama. He said that, to ensure accuracy, the performance of an 1-5000 should be verified by use of a simulator at the time a breath test is administered, and that to ensure reliability, two breath tests should be administered. He testified that the simulator is inexpensive compared to the 1-5000 and that the sequence of using a simulator and administering two breath tests takes about eight minutes, so that adoption of these procedures would be practical.
*207 As to Alabama’s program of testing the I-5000’s once every 30 days, Jensen said that this method prevents one from knowing what the calibration is between inspections. He said that physical or mechanical changes or transient electronic effects can change the results. He further testified that, if the state does inspect the machines only once a month, the various functions of the machine — the interferant detector, the mouth alcohol detector, the ambient air detector, the deficient sample detector, the time sequence to collect a proper breath sample, and the pressure switch — should be tested. At the very least, said Jensen, there should be written rules for inspections so that there can be some assurance that all inspections are performed in the same way and in a meaningful manner. For example, Jensen criticized the inspection described by Sgt. Means, saying that the printer on the 1-5000 should not be turned off, that the numerical results of the simulations should be recorded rather than the notation “checks OK,” that the samples should be used for only 30 days or 25 simulations, and that the range of values that will be acceptable should be specified.
There was evidence that, before and after a breath test, the 1-5000 sets itself to zero.' Dr. Jensen explained that this was not an internal check for calibration or accuracy, but only the setting of a baseline to adjust for the presence of any alcohol in the air of the room. This setting to zero, according to Dr. Jensen, does not assure that the 1-5000 will accurately measure a breath sample. The DFS witnesses did not contradict Dr. Jensen’s testimony in this regard. Based on this evidence, we hold that the Court of Criminal Appeals in Harris v. State, 601 So.2d 1099 (Ala.Cr.App.1991), erroneously followed Ex parte Reed, 492 So.2d 293 (Ala. 1986), in holding:
“The State is not required to prove that the machine used for testing had been previously determined to be accurate and had been periodically inspected. Ex parte Reed, 492 So.2d [at] 294 (Ala.1986). Trooper Hall testified that the instrument checks itself, sets to zero, takes its sample, then resets to zero, thus establishing the internal accuracy checks. Hence, it was merely harmless error for the trial court to allow Hall to testify concerning the log.”
601 So.2d at 1102 (emphasis added). Reed concerned a P.E.I. machine, which, as explained above, was calibrated by the operator at the time of a breath test. The error in the conclusion that the 1-5000 internally checked itself for accuracy was not apparent from the record in Harris (this Court quashed its writ of certiorari), but, now that the error is apparent from Dr. Jensen’s testimony, we overrule Harris to the extent that it relied on such a conclusion.
Dr. Jensen also said that the training program for officers who are to administer tests should be ascertainable from the rules. He said that, at a minimum, the rules should describe the testing of the officers, such as the measurements they are to perform, and should set forth what constitutes a passing-score.
There was some testimony to contradict Jensen’s evidence. Sgt. Means testified that he and the seven other inspectors for the state also teach at the training program in Selma. He said that the course lasts two and one-half days, that the officer in training has to perform 10 tests correctly, and that a passing grade is 70. He was trained by the manufacturer of the 1-5000 and by individuals from DFS. He could not recall how many I-5000’s had failed inspection, but he could recall five “Since I’ve been back ... from Saudi Arabia,[4] about three, four months.” There was no evidence of how many machines he tested, but he was testing machines over a large area of the state, partly because his department was short one inspector. Generally, the evidence indicated that the I-5000’s are relatively consistent and reliable. Buttram testified that, on a number of occasions, blood tests had been performed on suspects after 1-5000 breath tests had been taken, and that the results of the two tests were consistent, with the breath test results tending to be slightly lower than the blood test results.
The question before us, therefore, is whether the failure to specify the inspection *208 procedures in administrative rules is a failure to meet the statutory requirement that the chemical analysis “shall have been performed according to methods approved by the department of forensic sciences” or to meet the requirements of due process of law, as noted in footnote 1 of Patton v. City of Decatur. Three further points are important to our decision on this question.
First, the second prong of Mayo’s first issue, the failure to require use of a simulator on the 1-5000 at each breath test and to require two breath tests, is related to the first prong, regarding inspections. Although Jensen testified that these additional procedures are necessary to give a sufficient guarantee of accuracy and reliability to support admission of the results into evidence, there was evidence to the contrary from But-tram and Means. Furthermore, Jensen did not give evidence that the failure to require these procedures in fact meant that test results were inaccurate and unreliable, only that they could be inaccurate and that one could have less confidence in the accuracy and reliability of the tests. On the whole, we deem this to be a factual question as to which deference is due to the administrative agency, and we see no clear abuse of discretion by DFS in choosing not to require these procedures. However, the failure to verify the accuracy and reliability of the 1-5000 at each individual breath test makes the monthly inspection more critical. We contrast this situation with the situation involving the P.E.I. machine, which was calibrated each time a test was given, causing the Court to hold in Bush and Reed that this individualized calibration made the monthly inspection less important.
Second, the second issue raised by Mayo in his petition, the failure of DFS to formally adopt the rules promulgated by the Board of Health, also relates to the issue of failure to adopt rules regarding inspection of the machines. The 1-5000 was substituted for the P.E.I. a short time before the responsibility over the program was transferred to DFS,[5] so DFS has had more experience with administering tests on the 1-5000 than the Board of Health had. Rabren may be correct in his assertion that the rules were effectively transferred by operation of Act No. 88-660 (now codified as §§ 32-5A-194 and -194.1), but the fact remains that the rules as they exist in the Administrative Code do not correctly apprise the public of the existing procedures, because they are found under rules pertaining to the State Board of Health or the Department of Public Health rather than under rules pertaining to the Department of Forensic Sciences and because they refer to actions to be taken by the state health officer, not by the director of DFS. More important, DFS has made a substantial change in its inspection procedures, decreasing the margin of error that will be tolerated in 1-5000 inspections from 10% to 5%, without this fact being reflected in any rules that are readily available to the public. This change illustrates the fact that, until DFS formally adopts the published rules in the Administrative Code, DFS is unlikely to make any formal amendments to the rules to reflect changing procedures. Moreover, it shows that DFS may well have implicitly modified the rules as adopted by the Board of Health, in which case § 32-5A-194.1 may not operate to continue those rules in force.
The third point we wish to make relates to the consequence of a breath alcohol test. In Curren v. State, 620 So.2d 739 (Ala.1993), this Court held that having a .10% blood alcohol content is a “per se” violation of § 32-5A-191(a)(l), which prohibits a person from driving or being in actual physical control of a vehicle while “There is 0.10 percent or more by weight of alcohol in his blood.”[6] The Court held that the prosecuting authori *209 ty does not have to prove that the defendant was under the influence of alcohol in any other respect when it prosecutes under this provision and introduces a chemical test showing a blood alcohol content of 10% or more. Thus, the result of such a test is crucial to the defendant in such a prosecution. Because driving with a blood alcohol content of .10% or more is per se illegal, and because the state administers the tests that provide evidence of blood alcohol content, due process requires the state to carefully control the tests it administers to supply proof of blood alcohol content.
Taking into account all these factors, we hold that the rules found in the Alabama Administrative Code at Rule 420-1-1-.01 of the Rules of the Alabama State Board of Health/the Alabama Department of Public Health do not meet the requirement of § 32-5A-194(a)(l) that chemical analyses “shall have been performed according to methods approved by the department of forensic sciences.” At a minimum, DFS should adopt these rules as its own[7] and should adopt particularized rules to ensure that the Intoxi-lyzer 5000 machines are effectively inspected for accuracy and reliability. If DFS chooses to adopt the procedures advocated by Mayo’s witness for testing the machine with a simulator at the time of a breath test and for administering two breath tests, the significance of any periodic inspections will decrease and the inspection rules may correspondingly be less specific in that respect.
However, this holding does not decide the question whether Mayo’s conviction should be reversed. This Court and the Court of Criminal Appeals have held that when the statutory predicate for admission is not established, the results of a chemical test for intoxication may still be admitted if the prosecution establishes a sufficient predicate under traditional evidentiary rules for the admission of scientific test results. The Court of Criminal Appeals has described such a predicate for admission of the results of a P.E.I. test without reliance on § 32-5A-194:
“To establish a predicate for admitting the test results, without reliance on the statute, there should be evidence that:
“(1) the theory underlying the photoelectric intoximeter test is valid and generally accepted as such;
“(2) the intoximeter is a reliable instrument and generally accepted as such;
“(3) the intoximeter test was administered by a qualified individual who could properly conduct the test and interpret the results; and
“(4) the instrument used in conducting the test was in good working condition and the test was conducted in such a manner as to secure accurate results.
“See, E. Imwinkelried, Evidentiary Foundations, p. 92 (1980).”
Moore v. State, 442 So.2d 164, 167 (Ala.Cr. App.1983); McDaniel v. State, 506 So.2d 360, 364 (Ala.Cr.App.1986).
In Aycock v. Martinez, 432 So.2d 1274, 1277 (Ala.1983), this Court stated:
“While we find no Alabama cases which specifically outline all the requisite elements of a predicate for the admission of scientific test results, it is generally held that such a predicate must show that the circumstances of the taking of the sample, the identification, maintenance, and transporting of it, and the testing itself are scientifically acceptable and reasonably expected to produce results which are accurate and reliable. See, e.g., 29 Am.Jur.2d, Evidence, [§] 830 (1967).”
This formulation was applied in Kent v. Singleton, 457 So.2d 356, 359 (Ala.1984).
These two tests are substantially the same, with the difference that the Moore predicate focuses on the method of testing, with only the last point mentioning the manner in which the test was conducted, whereas the Aycock predicate focuses on the taking and preservation of the sample, with only the last point mentioning a requirement that the test be scientifically acceptable. Aycock and Kent concerned blood tests, which require *210 preservation of the blood sample until the test is performed. The Moore formulation seems more appropriate to a predicate for a breath test, because the sample is taken and tested simultaneously. Thus, we hold that the Moore predicate, substituting the 1-5000 for the P.E.I., is appropriate for admission of breath tests where the requirements of § 32-5A-194 are not met.
The evidence in this case suffices to lay such a predicate. The first two elements were affirmatively shown even by Jensen’s testimony. As to the third element, Mayo attempted to call into question the training of test operators such as the officer who administered his 1-5000 test, but no substantial defect in the officer’s training or qualifications was shown. Although Mayo argues that the 1-5000 was not shown to be in good working condition and that the test was not shown to have been conducted in such a manner as to secure accurate results, we disagree with this conclusion. The log book showed that Sgt. Means had inspected the I-5000 11 days before Mayo’s test and that it “checked OK.” He inspected it again 22 days later and it still “cheeked OK.” There is no showing of any substantial likelihood of a transient failure of the 1-5000 between the two testing dates.
Furthermore, the evidence indicates that “the test was conducted in such a manner as to secure accurate results.” Moore, supra. Although Jensen testified that an on-the-spot simulator test would have given a higher confidence in the machine’s accuracy and that two breath tests would have given a higher assurance of the reliability of the test, he did not testify that the single test as administered was likely to be inaccurate. The actual administration of the 1-5000 test is quite simple, and the evidence of its administration to Mayo is sufficient to meet this part of the general predicate. Thus, although Mayo has successfully challenged the statutory predicate by showing the inadequacy of the administrative rules, he has not shown any defect in the general predicate for admission of the 1-5000 test results.
Mayo argues, however, that his consent was not voluntarily given, because, he says, he was told that his driver’s license would be suspended if he refused to take the 1-5000 test. He argues that the implied consent law implies a driver’s consent only to approved methods of chemical testing and that, because DFS has not adopted rules for administering tests, the 1-5000 is not an approved testing method and cannot be administered without voluntary consent. He bases this argument on State v. Polak, 598 So.2d 150 (Fla.Dist. Ct. App.1992):
“[B]ecause the intoximeter here was not an ‘approved’ instrument, as required by section 316.1932(l)(a), the tests given to the defendants could not be considered ‘approved’ tests. As their consent was based on misinformation, namely, that their licenses would be suspended for failure to submit to an unapproved test, the defendants’ consent cannot be deemed voluntary pursuant to the [State v. Burnett, 536 So.2d 375 (Fla.Dist.Ct.App.1988),] rule.”
598 So.2d at 153-54 (footnote omitted).
We do not read Ala.Code 1975, § 32-5-192, as naiTowly limiting the test to be administered only to such tests as would be admissible pursuant to the statutory predicate of § 32-5A-194. Section 32-5-192(a) reads:
“Any person who operates a motor vehicle upon the public highways of the state shall be deemed to have given his consent, subject to the provisions of this division, to a chemical test or tests of his blood, breath or urine for the purpose of determining the alcoholic content of his blood if lawfully arrested for any offense arising out of acts alleged to have been committed while the person was driving a motor vehicle on the public highways of this state while under the influence of intoxicating liquor. The test or tests shall be administered at the direction of a law enforcement officer having reasonable grounds to believe the person to have been driving a motor vehicle upon the public highways of this state while under the influence of intoxicating liquor. The law enforcement agency by which such officer is employed shall designate which of the aforesaid tests shall be administered. Such person shall be told that his failure to submit to such a chemical test will result in the suspension of his *211 privilege to operate a motor vehicle for a period of 90 days; provided if such person objects to a blood test, the law enforcement agency shall designate that one of the other aforesaid tests be administered.”
(Emphasis added.)
In Lunceford, v. City of Northport, 555 So.2d 246 (Ala.Cr.App.1988), the Court of Criminal Appeals held that the implied consent statute applies only to operators of vehicles on the public highways, so that Lunee-ford, arrested in an automobile on a private parking lot, could not be deemed to have given his implied consent to a chemical test for intoxication. The requirement that the person be operating a motor vehicle upon a public highway is specifically stated in § 32-5-192(a). That Code section does not, however, require the test to have been approved by DFS, but only to have been designated by the law enforcement agency making the arrest. The officer who administered the I-5000 test to Mayo testified that the City of Madison Police Department had designated the 1-5000 as a breath test for alcohol. The court in Polak quoted the Florida statute at issue, which is substantially similar to our § 32-5-192(a), with the significant difference that a person operating a motor vehicle in Florida shall “be deemed to have given his consent to submit to an approved chemical test.” 598 So.2d at 151, fn. 3, quoting Fla. Stat. (1989) § 316.1932(l)(a) (emphasis by the Florida District Court of Appeal). The Florida court relied on the requirement of “approval” in affirming the trial court’s holding that the results of the unapproved test should be suppressed; see footnote 7. Because our corresponding section does not require approval of the test for the implied consent law to operate, we decline to hold that the implied consent law was violated here so as to preclude the admission of evidence concerning Mayo’s test result. Although the requirements of § 32-5A-194 were not met, and the results were therefore not admissible without the prosecution’s laying a general evidentiary predicate, the requirements of § 32-5-192 have been met so as to give effect to the implied consent law.
For the foregoing reasons, the judgment of the Court of Criminal Appeals is affirmed.
In holding the existing rules inadequate under the showing made by Mayo, we note that this ruling will not apply to any other case already tried, unless the defendant in that case made a similar showing and objected to admission of the evidence of the test, on the ground that the statute did not make the evidence admissible. In cases arising hereafter but before the Department of Forensic Sciences adopts appropriate rules, if a defendant makes a sufficient objection to a breath test result, the prosecuting authority may have to lay a general evidentiary predicate to make evidence of the test admissible. The evidence here suggests that it would be sufficient to show that the test was administered by a qualified officer in the usual manner and that the 1-5000 in question passed inspection before and after the test.
AFFIRMED.
HORNSBY, C.J., and SHORES, HOUSTON, STEAGALL, KENNEDY, INGRAM and COOK, JJ., concur.
MADDOX, J., concurs in the result.

. Act No. 88-660 also added the sentence, "The court trying the case may take judicial notice of the methods approved by the department of forensic sciences.” This question of judicial notice was mentioned in the dissent in Elmore v. State, 348 So.2d 269 (Ala.1977), but that case was decided before the effective date of the Alabama Administrative Procedure Act, see Ala.Code 1975, § 41-22-27.

. The Court applied tit. 36, § 155, Ala.Code of 1940 (Recomp. 1958). That section became Ala. Code 1975, § 32-5-193. Section 32-5-193 was repealed by Act No. 80-434, which enacted § 32-5A-194. The Court in Patton quoted language from § 155 that is substantially the same as the pertinent language of § 32-5A-194.

. Although § 32-5A-194(a)(l) states that "the court trying the case may take judicial notice of the methods approved by the department of forensic sciences,” we are unaware of how we might obtain copies of internal written protocols that were not introduced at trial. We take this provision to refer only to rules properly promulgated in accordance with the Administrative Procedure Act, Ala.Code 1975, § 41-22-1 et seq. See Ex parte Vizzina, 533 So.2d 658 (Ala.1988).

. A reference to participation in the Persian Gulf War in early 1991.

. The earliest case we have found in which a test was administered on an 1-5000 is Kelley v. State, 519 So.2d 1368 (Ala.Crim.App. 1987), decided on March 10, 1987. Cf. Stamp v. State, 495 So.2d 725 (AIa.Cr.App.1986), which refers to "the new Intoxolizer machine” as "a field testing device whose results are used as an aid to the officer, but not as evidence in court." Id., at 725.

. Mayo was charged under § 32-5A-191(a)(2), driving while "under the influence of alcohol.” In addition to the evidence of the breath test result, there was evidence that he drove off the road twice and that he failed several field sobriety tests.

. This problem with the rules is not sufficient of itself to prevent admission of a result of chemical analysis pursuant to § 32-5A-194. Thus, we do not imply that tests of blood, urine, or other bodily substances may not be admitted under Rule 420-1-1-.02 until DFS adopts that rule as its own.